JOHN D. BREWER

*v.*

APPALACHIAN CONSTRUCTORS, INC., *et al.*

(No. 10509)

Submitted April 22, 1953.    Decided June 16, 1953.

438

LOVINS, JUDGE, concurring

*Jesse M. Jaco,* for American Oil Co.

*Furbee & Hardesty,* for Appalachian Constructors, Inc. and Victor Zeni.

*Minter L. Wilson, Russell L. Furbee, C. H. Hardesty, Jr.,* and *John Crynock,* for Dale Mayfield.

*Albert M. Morgan,* for defendant in error.

RILEY, JUDGE:

This is an action of trespass on the case instituted in the Circuit Court of Monongalia County by John D. Brewer against Appalachian Constructors, Inc., a corporation, Victor Zeni, American Oil Company, a corporation, and Dale Mayfield, to recover damages for personal injuries received as the result of an explosion occurring at Brock Mine of Christopher Coal Company in Monongalia County on December 29, 1949. To a judgment in the amount of $93,800.00, based on a verdict in favor of plaintiff, the several defendants prosecute this writ of error.

Appalachian Constructors Inc., hereinafter referred to as "Appalachian", with Victor Zeni as its president and general manager, was engaged in the work of sinking an air shaft at Brock Mine of Christopher Coal Company in Monongalia County. The American Oil Company, hereinafter referred to as "American", and Mayfield, owner and operator of a tank wagon, were engaged in the business of selling gasoline. While the declaration charges that Mayfield was the agent of American, in the trial American took the position that Mayfield was, in fact, an independent contractor.

American and Mayfield entered into a written agreement, dated October 7, 1949, in which Mayfield is referred to as "Buyer", whereby American agreed to sell and deliver to Mayfield, and Mayfield agreed to purchase from American, Mayfield's requirements, for resale by Mayfield for his account and net for the account of American, all American's brands of gasoline, kerosene, and fuel oil, upon certain terms and conditions set forth in the written agreement. This agreement provides, among other things, in Paragraph 5 that Mayfield will assume and pay to American all taxes, duties and other charges with respect to the manufacture, sale, delivery or use of said products, which American may be required to pay or collect under any municipal, state or federal law now in effect, or hereafter enacted; and that the Buyer will pay to American all such taxes, duties and other charges at the time of payment for the products supplied by American, the amount of which shall be added to the invoices therefor.

For the purposes of this decision it is unnecessary to make further reference to the provisions of the agreement, except that the agreement does not expressly or impliedly give to American the right to control Mayfield's activities in the resale of American's products.

This contract contemplated that in the resale of American's products by Mayfield, Mayfield would use his own tank wagon, which contained three compartments, one with a capacity of 242 gallons, and the other two, 313 and 145 gallons, respectively.

Originally in this action Christopher Coal Company was impleaded as a party defendant with the defendants who are prosecuting their respective writs of error. Upon certificate had to this Court on the demurrers to plaintiff's declaration, this Court overruled the demurrers as to all defendants, except Christopher Coal Company and its employee, Guy Hinerman, dismissing them as parties defendant. Christopher Coal Company was engaged in the business of mining coal in Monongalia

County. *Brewer* v. *Appalachian Constructors, Inc., et al.,* 135 W. Va. 739, 65 S. E. 2d 87.

Plaintiff was severely injured about two o'clock in the afternoon of December 29, 1949, by an explosion which occurred in a house, designated in the record as the "sand house", a building approximately 16 feet by 24 feet, of concrete block construction, owned by Christopher Coal Company, in which the coal company stored sand for use in its nearby mine; and in which there was a coal stove used by the coal company for the purpose of drying sand, which was burning at the time of the explosion. At the time of the explosion Appalachian was an independent contractor, engaged by the coal company to drill a vertical shaft. This record contains no plat showing the relative locations of the various structures involved in this case, and there is not a single reference in the record to the points of the compass. However, from a photostat contained in the record, and reading the photostat from right to left, in the middle third thereof, the photostat discloses at the right the general location of the shaft which was being driven by Appalachian; next the general location upon which the sand house once stood before its complete demolition by the explosion; and at the far left what is designated as the "machine shop", which, according to the evidence was located within eight feet of and directly in line behind where the sand house was located. The machine shop was owned and operated by the coal company in connection with the operation of its mine. The explosion was of such severity that it not only completely destroyed the sand house, but demolished the end of the machine shop nearest thereto. In the foreground and on a level slightly below that on which the machine shop, sand house, and shaft are located, are railroad tracks, and in the background there is a highway on a hillside, which runs parallel with the railroad tracks. This highway was about level with the roof of the sand house. Some time before the explosion the coal company had erected a ramp leading from the highway to the roof of the sand house, for the use of

trucks which were wont to back up the ramp and dump their loads of sand in an opening in the roof of the sand house, which opening was four feet by seven feet.

Some time prior to December 8, 1949, the defendant, Victor Zeni, talked with Harry Conway, branch manager of American, relative to securing a tank for the storage of gasoline to be used in Appalachian's operations. On December 8, 1949, Mayfield, at the instance of American, delivered a 280-gallon tank, owned by American, and at the direction of Chris Tennant, a supervisor of Appalachian, installed the tank in the corner of the sand house, immediately under the trap door in the roof. Mayfield expressed his disapproval of the place where the tank was being installed, because of the presence of the coal stove, which, as heretofore stated, was used to dry the sand. On the following day, December 9, 1949, Mayfield furnished and assisted in installing a vent pipe, which extended from the tank up through the trap door in the roof. At that time Mayfield delivered to Appalachian 242 gallons of gasoline from his tank wagon, through the trap door in the roof of the sand house, the tank wagon at that time having painted on its sides in bold letters "AMOCO GAS", and being decorated in the conventional colors used by American for advertising purposes. After delivering to Appalachian the contents of one of the compartments of his tank wagon, namely 242 gallons of gasoline, Mayfield presented his statement to Tennant, supervisor of Appalachian, and was paid by Appalachian's president Zeni.

On the day of the explosion, December 29, 1949, Tennant called American, and stated that Appalachian was out of gasoline. Shortly thereafter Tennant sent Flegal, an employee of Appalachian, to American's bulk plant to order 242 gallons of gasoline. At that time Flegal at Tennant's direction picked up a 55-gallon drum of gasoline and two crates of oil. Later when Mayfield arrived with his tank wagon at American's plant, he was told that Appalachian was out of gasoline, and to proceed

there with 242 gallons of gasoline. While Mayfield had knowledge that Appalachian had secured a 55-gallon drum of gasoline earlier in the day, he denied having any knowledge of the fact that there were eight inches of gasoline in Appalachian's gasoline tank in the sand house, although Tennant testified that Mayfield was so advised.

According to Mayfield, he placed his tank wagon on the ramp above the sand house, and then went down and inquired from the supervisor of Appalachian, Tennant, if the 55 gallons of gasoline in the drum theretofore delivered by American at its bulk plant to Appalachian's employee Flegal had been put in the gasoline tank in the sand house, and was informed that it had not; that he, Mayfield, then returned to the tank wagon and emptied the 242-gallon compartment, turned off the valve, and then went back to the place where Tennant was standing, and presented a statement for the 242 gallons of gasoline and the 55 gallons of gasoline in the drum, or a total of 297 gallons.

Tennant testified that he told Mayfield that he would not sign for that much gasoline, because there were eight inches of gasoline in the tank which could not be removed with the pump. This witness further testified that Mayfield replied, "in that case, we might run it over"; to which the witness, handing back the statement, said that he "had better not." Following this conversation Tennant stepped to the door of the sand house, opened it, and found the floor thereof saturated with gasoline and with puddles of gasoline gathered thereon, which had been ignited from the flame in the coal stove. Tennant testified that he called to Zeni to get the men out of the shaft, and directed Mayfield to get the tank wagon away from the sand house. For the purpose of getting the tank wagon, which was then parked on the roof of the sand house, "out of there", Mayfield ran to the tank wagon and hurriedly drove it away from the sand house. As the hose leading into the tank, through which Mayfield

delivered the 242 gallons of gasoline into the storage tank through the intake in the tank, was pulled out of the intake and the opening in the sand house, it "flipped" up the side and over the roof of the building, and immediately the rafters and roof caught fire.

Mayfield was not paid by Appalachian for the 242 gallons of gasoline delivered at the sand house, nor was payment made for the 55 gallons contained in the drum. However, it appears that Mayfield paid American for the tank wagon deliveries of December 9 and December 29, 1949, respectively. Mayfield testified that he had no dealings with Appalachian until he was handed Appalachian's account by American; that he first met Tennant when he delivered the first 242 gallons of gasoline to the 280-gallon tank of Appalachian located in the sand house; and that Appalachian ordered its gasoline directly from American.

There is a conflict in the evidence as to whether dynamite was stored in the sand house.

At the time of the explosion Brewer was forty-nine years of age and in good health. Immediately after the explosion Brewer was seen to run, staggering, screaming and moaning, out of the machine shop door, bleeding badly at his face and neck, and appeared to be delirious. That Brewer's lacerations were numerous is beyond doubt. The attending physician testified that it required four hours to extract the glass from Brewer's eyes, face and body; and that he took one hundred and forty-four stitches in Brewer's face and neck. Brewer's right eyeball was cut, having a large piece of glass protruding from it, and the eyeball had to be immediately removed. A large piece of glass severed the ulnar nerve inside his right elbow, which resulted in an operation on January 6, 1950, on his right arm. Therapy disclosed that there was a tumor of the ulnar nerve, which prompted the attending physician again to operate on that arm on November 16, 1950. Plaintiff has suffered considerable loss of function of the right arm, and the muscles have wasted away,

though there is evidence that there has been some improvement. There is testimony that the ulnar nerve will grow about one millimeter a week, which is approximately one inch in ten weeks.

As a result of the explosion Brewer has numerous scars on his face and neck. Since the explosion plaintiff has been unable to work; and at the time of the trial in November, 1951, he was still suffering from nausea, headaches, fainting spells and sleeplessness. His disability is such that his wife dresses, shaves and bathes him. At the time of the trial plaintiff had a life expectancy of 20-6/10, which would make his age at the end of that expectancy 71.64 years; and also at the time of the trial plaintiff had received or would receive from the Workmen's Compensation Fund a total of $6,200.00.

The trial court gave all of American's instructions, namely, Nos. 35, 36, 37, 38, and 39. These instructions required the jury to determine from the evidence whether Mayfield was the agent of American or an independent contractor, and told the jury that American was not liable for the negligence of Mayfield, unless the jury should determine that he was American's agent. A peremptory instruction in American's favor, instruction No. 34, was refused.

The case having been submitted to the jury, the jury rendered two verdicts, the first of which reads: "We, the jury find for the plaintiff against the four defendants, Dale Mayfield, The American Oil Co., Victor Zeni and Appalachian Constructors, Inc., and hold that Appalachian Constructors, Inc., is responsible for Victor Zeni and that American Oil Company is responsible for Dale Mayfield to the amount of $100,000 less $6,200 which the plaintiff has or will receive from state compensation. And that the Appalachian Constructors pay $46,900; and that the American Oil Company pay $46,900. O. L. Clingan." The trial court, on defendants' objection, refused this verdict, because it provided for a "split verdict."

As soon as the jury returned its first verdict, the plaintiff by his attorney moved the court to require the jury again to retire to its room, and the Court instructed the jury that the verdict must be joint and several; and that if the jury should bring in a verdict against all four defendants it cannot designate the amounts which certain defendants are to pay on the verdict. Mayfield's attorney objected to plaintiff's motion on the ground that the verdict exonerated Mayfield; that the jury having already brought in its verdict any action of the court would result in requiring the jury to bring in a second verdict; that the court told the jury, or at least asked the jury, if the first verdict was its verdict; that the first verdict has already been recorded by the trial court, and is a final verdict; and further that the instruction embraced in plaintiff's motion would amount to the trial court telling the jury to find against all four defendants and that is not the effect of the present verdict. American, by its attorney, and Appalachian and Zeni, by their attorney, objected to the trial court taking any action on the motion.

The trial court then, over the objection and exception of Mayfield, American, Appalachian and Zeni, by their respective attorneys, instructed the jury, in writing: "That you must consider whether or not each, or any of the four defendants is or are liable to the plaintiff. If you find for the plaintiff against any one or more of the four defendants, you cannot divide the amount of your verdict between the defendants against whom you find, but must find one sum against all of those against whom you find." After having retired for some time, the jury rendered the verdict upon which the instant judgment is based, and having been polled the members of the jury stated that the second verdict was the verdict of the jury, which verdict reads: "We, the jury, find for the plaintiff against the defendants as follows: Dale Mayfield as agent of American Oil Company, American Oil Company, Victor Zeni, and the Appalachian Con-

structors, Inc., and hold that American Oil is responsible for Dale Mayfield and Appalachian Constructors, Inc., is responsible for Victor Zeni in the amount of $100,-000.00 less $6,200.00 which the plaintiff has or will receive from the West Virginia State Compensation Fund."

The errors assigned summarized are: (1) Did the trial court err in refusing to accept the first verdict of the jury and in accepting the second verdict; (2) did the trial court err in entering the joint judgment in the amount of $100,000.00, less $6,200 received or to be received by plaintiff from the Workmen's Compensation Commission on the second verdict; (3) did the trial court err in submitting to the jury on the basis of American's instructions Nos. 35, 36, 37, 38, and 39, the question whether Mayfield was American's agent or an independent contractor; and (4) was the verdict of the jury in the net amount of $93,800.00 excessive?

The question whether the trial court erred in rejecting the first verdict returned by the jury may be disposed of without much comment. Though by its verdict the jury found in favor of the plaintiff and against the defendants, Appalachian and American, in the amount of $100,-000.00, less $6,200.00, which the plaintiff has or will receive from the Workmen's Compensation Fund, or $93,-800.00, the jury rendered what may be termed a "split verdict" in that the verdict found in favor of plaintiff and against each of the defendants Appalachian and American in the amount of $46,900.00. A prevailing postulate governing the law of torts is that the liability for a tort under a verdict against two or more joint tort feasors is joint and several. *Massey* v. *Payne*, 109 W. Va. 529, pt. 2 syl., 155 S. E. 658. Where, however, a proper verdict in a tort action is returned against two or more joint tort feasors, a joint judgment should be rendered on the verdict.

We are, therefore, of opinion that the first verdict returned by the jury was not in proper form, in that a joint judgment should not have been entered on the ver-

dict. Truly, the trial court did not err in rejecting this verdict, and in doing so the case then stood without a proper verdict.

As a corollary to the foregoing it follows that it then and there became the duty of the trial court in the conduct of this important case to require the jury to retire for the purpose of arriving at and returning a proper verdict; and in doing so the trial court *ex necessitate* had the duty, as it did, to tell the jury why the court had rejected its verdict, and its instructions in that regard were clear, and properly informed the jury as to its duty. By this oral instruction the court told the jury that "If you find for the plaintiff against any one or more of the four defendants, you cannot divide the amount of your verdict between the defendants against whom you find, but must find one sum against all of those against whom you find."

To the rulings of the court in rejecting the first verdict, requiring the jury to retire and in instructing the jury as to what would be a proper verdict in the event it should find against one or more of the four defendants, all of the defendants objected and excepted.

The jury having returned the verdict upon which the instant judgment was entered, and defendants' counsel having moved for a new trial, we now come to the preliminary question whether this verdict is so defective in form that the instant judgment could not have properly been entered upon it. This verdict is indeed unique, in that the jury found thereby against the defendants: "Dale Mayfield, as agent of American Oil Co., American Oil Co., Victor Zeni, and the Appalachian Constructors, Inc."; and further found that "American Oil Company is responsible for Dale Mayfield and Appalachian Constructors, Inc., is responsible for Victor Zeni, to the amount of $100,000, less $6200 which the plaintiff has or will receive from the W. Va. State Compensation Fund."

The jury by its verdict against all four of the defend-

ants jointly, denominating the defendant Dale Mayfield "as agent of American Oil Co.", and then in unnecessary detail finding that "American Oil Company is responsible for Dale Mayfield and Appalachian Constructors, Inc., is responsible for Victor Zeni." By its verdict we think the jury found that all of the defendants were jointly liable to the plaintiff in the amount of $93,800.00; and that the language "as agent of American Oil Co.", as well as the language contained in the verdict to the effect that American and Appalachian are responsible, respectively, for Dale Mayfield and Victor Zeni, merely constitutes surplusage, and does not serve to render the verdict so defective in form that a proper judgment cannot be entered on it. Unnecessary matter appearing in a verdict will be regarded as surplusage, and will not vitiate the verdict. 19 M. J., Verdict, Section 9; *Bell* v. *Huntington Development & Gas Company*, 106 W. Va. 155, 145 S. E. 165.

This disposes of the first and second grounds of error upon which the defendants rely.

The basic and controlling question whether Mayfield was American's agent or an independent contractor was submitted to the jury by the giving of American's instructions Nos. 35, 36, 37, 38 and 39, and constitutes the third assignment of error in this Court.

The contract of October 7, 1949, between American and the defendant, Dale Mayfield, has an important bearing on the question of the relationship between American and Mayfield, whether that be a question of law or of fact. In this contract, as heretofore stated, American is designated as "American", and the defendant Mayfield is referred to as "Buyer". By this contract American agreed to sell and deliver to Mayfield, and Mayfield agreed to purchase from American his requirements for resale for his own account and for the net account of American, American's brands of gasoline, kerosene, and fuel oil, upon terms expressly set forth in detail in the contract, without expressly or impliedly reserving in

American any control over Mayfield's activities with regard to the matters contained in the contract. Technically, this contract set forth the relationship of seller and buyer, which, of course, in the absence of extrinsic evidence would preclude the idea that Mayfield was American's agent. Though strictly under the contract Mayfield was American's customer, he was likewise a customer having a contract with the seller for purposes specified in the contract, which activities were not governed by the contract, and in that sense unless there is extrinsic evidence, tending to establish that the parties had set up a different relationship, Mayfield had a contract with American upon an independent basis and was an independent contractor.

Certainly the contract of October 7, 1949, of itself did not constitute Mayfield American's agent. "The test of the relation between one having work done and the workman consists in the employer's right or lack of right to supervise the work. If that right exists, the relation is that of master and servant. If that right does not exist, the relation is that of employer and independent contractor." *Greaser* v. *Appaline Oil Co.*, 109 W. Va. 396, syl., 155 S. E. 170. And the test of the relationship of master and servant is the right to control the alleged servant's activities "and not the exercise of control." *Meyn* v. *Dulaney-Miller Auto Co.*, 118 W. Va. 545, pt. 2 syl., 191 S. E. 558; *Malcolm* v. *American Service Co.*, 118 W. Va. 637, pt. 3 syl., 191 S. E. 527.

The only extrinsic evidence contained in this record tending to show that American had such control over Mayfield's activities so as to constitute the latter the former's agent is: (1) Mayfield testified that on the occasion of the delivery of gasoline to Appalachian, he was transporting other gasoline for delivery to one of American's customers, F. J. Lemley, and that if American had called him on the telephone and instructed him to deliver the gasoline designated for Lemley to a designated person at Blacksville, a distance of approximately

twelve miles from Appalachian's operations, he would have done so; (2) that Mayfield complied with the instruction of American to deliver the 280-gallon tank for installation at Appalachian's operations, and that when the tank was delivered, it was installed under the control and supervision of Appalachian's superivsor; and (3) on the day of the explosion Mayfield's tank wagon was loaded to deliver the gasoline in two of the three compartments of the truck to plaintiff's witness F. J. Lemley, American's customer, and Mayfield's instructions from American were that he was to make the delivery to Appalachian "right away."

In furtherance of the position that Mayfield was acting as American's agent, Brewer's counsel argue that American held Mayfield out as its agent; that the words "AMOCO GAS" were painted by American on Mayfield's truck; and that Mayfield supplied only American's customers. American may have held Mayfield out as its agent and the words "AMOCO GAS" painted on Mayfield's truck may have constituted a representation to Appalachian and the public generally that Mayfield was American's agent, but such facts do not enter into the decision in this case. This case involves the question whether Mayfield was, in fact, American's agent: it involves the question of actual agency as distinguished from agency by representation or estoppel. If in the circumstances of this case a representation of agency may have been made by American to Appalachian or to others, there is no evidence in this record tending to show that anyone relied upon that representation to his detriment. Agency by representation or estoppel, sometimes designated as "apparent agency", involves a case in which there may be no agency in fact, but by representations upon which reliance is had, the person making those representations is estopped to deny the relationship of principal and agent, or, in the case of an employer, of employer and employee. *Gallagher* v. *Washington County Savings, Loan and Building Co.,* 125 W. Va. 791, 25 S. E.

2d 914; 1 Restatement of the Law, Agency, Section 8, comment a; 1 M. J., Agency, Sections 17 and 20.

Plaintiff's counsel assert that though Mayfield at the time of the explosion may have been acting as an independent contractor rather than as American's agent, American is not relieved from liability for the reason that Mayfield was engaged by American to perform intrinsically dangerous work.

Counsel cite in support of this position *Walton* v. *Cherokee Colliery Co.,* 70 W. Va. 48, 73 S. E. 63, point 1 of the syllabus of which reads: "Generally, if one let work, lawful within itself, to a contractor and retain no control over the manner of its performance, he is not liable on account of negligence of the contractor or his servants. But if the work is intrinsically dangerous, or is of such character that injury to third persons, or to their property, might reasonably be expected to result directly from its performance, if reasonable care should be omitted, the employer is not relieved from liability by delegating the performance of the work to an independent contractor." See *Trump* v. *Bluefield Water Works & Improvement Co.,* 99 W. Va. 425, pt. 2 syl., 129 S. E. 309, and the very recent case of *Law* v. *Phillips,* 136 W. Va. 761, pt. 5 syl., 68 S. E. 2d 452. This rule, however, has no application to the instant case. While it is true that the careless and negligent handling of gasoline is inherently dangerous, likewise it is true that if the gasoline in the instant case had been handled in a careful manner, Brewer would not have suffered the injuries complained of in this action. Surely American could not have reasonably anticipated that Mayfield would pour such a quantity of gasoline into the tank in the sand house of Christopher Coal Company as to overflow and cause the explosion; and there is nothing in this record to charge American with knowledge that Christopher Coal Company had placed a coal stove in its sand house, which stove was burning at the time of the explosion, and had stored there quantities of dynamite, the latter of

which was the effective cause of the explosion resulting in plaintiff's injuries.

The question whether the verdict in the amount of $93,800.00 is so high that it shows that it was the result of prejudice on the part of the jury is a serious one. Bearing directly on this question are the facts that at the time of the explosion plaintiff was forty-nine years of age, with a life expectancy of twenty-two years, and an average yearly earning capacity of $3,168.35. Thus without regard to the pain and suffering which plaintiff has undergone and is undergoing, as shown by this record, plaintiff has suffered and will suffer a loss of earning capacity of $69,703.70. The verdict in the amount of $93,800.00, together with the sum of $6,200.00 paid or to be paid to the defendant from the Workmen's Compensation Fund, is tantamount to a verdict in the amount of $100,000.00. Deducting plaintiff's earning capacity during his life expectancy of $69,703.70, the verdict of the jury contains an element of $30,296.30 solely for pain, suffering and inconvenience because of the very serious injuries which the plaintiff has suffered. If the verdict is allowed to stand, and plaintiff is able to invest the $93,800.00 contained in the verdict at three per cent interest, he will receive yearly $2,814.00, an amount almost equal to his annual earning capacity, and at the end of his life expectancy of twenty-two years, if he is then living, he will still have intact the fund of $93,800.00 embraced in the instant verdict.

We are of opinion from this analysis of the instant verdict that it is clearly excessive and should be set aside on that ground. We say this because we think that the verdict, embracing as it does an element in the amount of more than thirty thousand dollars for pain, suffering and inconvenience, growing out of plaintiff's serious injuries, shows that the verdict is the result of mistake, partiality in favor of and sympathy for plaintiff, prejudice, or lack of due consideration, and should be set aside on this writ of error. In *Webb* v. *Brown & Williamson*

*Tobacco Co.,* 121 W. Va. 115, 122, 2 S. E. 2d 898, this Court, speaking through Judge Fox, stated the rule that " * * * the verdict of a jury will not be disturbed except where it plainly appears to have resulted from mistake, partiality, passion, prejudice or lack of due consideration. * * * ".

For the foregoing reasons the judgment of the Circuit Court of Monongalia County is reversed, the verdict set aside, and a new trial awarded.

> *Judgment reversed;*
> *verdict set aside;*
> *new trial awarded.*

LOVINS, JUDGE, concurring:

I think the Court's opinion well justifies the holding that the verdict of the jury should be set aside. I think, however, there is additional ground for setting aside the verdict accepted by the trial court in this case.

As stated in the Court's opinion, there are two verdicts. One was rejected by the trial court and the other was accepted and judgment rendered thereon. I prefer to designate these two alleged verdicts as "reports", rather than verdicts.

This Court's opinion approves the action of the trial court in rejecting the first report, but applying the well established rule that surplusage in a verdict may be disregarded, and judgment rendered thereon, when the verdict is in such language that a general finding is not affected by the unauthorized language, held that the second report was good as a verdict. See *Bell* v. *Develop. & Gas Co.,* 106 W. Va. 155, 159, 145 S. E. 165; *Coal & Coke Co.* v. *Fuel Co.,* 98 W. Va. 374, 127 S. E. 81; *State* v. *McCoy,* 95 W. Va. 274, 120 S. E. 597; *Martin* v. *Ohio River R'd. Co.,* 37 W. Va. 349, 16 S. E. 589; *Harvey* v. *Com'th.,* 23 Gratt. 941. For a general discussion of an attempted apportionment of damages in a jury verdict, see Annotation 108 A.L.R. 792; 8 A.L.R. 2d 862. As to

the power of a trial judge to correct a verdict in the presence of the jury, see *Lowther* v. *Oil and Gas Co.*, 88 W. Va. 650, 108 S. E. 276. "When the meaning of the jury can be clearly collected from the verdict, it ought not to be set aside for mere want of form in wording; and if the points in issue are substantially decided, the trial court should mould the verdict into proper form." *Colliery Co.* v. *Pinkney*, 96 W. Va. 74, 122 S. E. 434.

I think that the cases decided that surplusage in a verdict may be rejected by a trial court are inapplicable to the instant case.

I would apply the rule to the second report stated in *Lewis and Frazier* v. *Childers et al.*, 13 W. Va. 1, 9. "Verdicts of juries are to be favorably construed; and if the point in issue is substantially decided by the verdict, it is the duty of the court to mould it into form." "Where the meaning of the jury can be clearly collected from the verdict, it ought not to be set aside for irregularity or want of form in its wording." But, in the *Frazier* case, a verdict reading as follows: " 'We, the jury, find for the defendants, and fix the line as shown on the Sinnett map, from C. to D.' ", was set aside. True the verdict in the *Frazier* case was returned in an action of ejectment. But this Court, in setting it aside held that the language did not clearly show an intention on the part of the jury to find a general verdict for the defendants and against the plaintiffs.

An analysis of the language contained in the second report in the instant case, shows that the jury found for the plaintiff and against the defendants; and further found that the American Oil Company was responsible for Dale Mayfield, one of the joint defendants, and that the Appalachian Constructors, Inc., another joint defendant, was responsible for Victor Zeni, likewise a joint defendant. The language of the jury's report is equivocal and indefinite, and furnishes a basis for a rational assumption that the finding of the jury discharged Mayfield and Zeni, two defendants, from responsibility for

the payment of the amount found by the jury. If the defendants, Mayfield and Zeni, should be discharged on the basis of the jury's finding, such action would contradict the general finding set forth in the second report of the jury. See *Coal Co. v. Eary,* 115 W. Va. 46, 174 S. E. 573.

In instances where the language of a purported verdict of a jury is equivocal, uncertain or indefinite, it should not be received as a verdict. On the contrary, it should be rejected or moulded by the court so as to be indefinite, certain form, and of undoubted meaning.