BETHLEHEM MINES CORPORATION

*v.*

CHARLES H. HADEN II, SUCCESSOR TO G. THOMAS BATTLE, *Tax Commissioner* OF THE STATE OF W. VA.

(No. 12822)

Submitted September 9, 1969.   Decided December 2, 1969.

Rehearing denied February 27, 1970.

*Chauncey H. Browning, Jr.,* Attorney General, *William F. Carroll, James G. Anderson III,* Assistant Attorneys General, for appellant.

*Jackson, Kelly, Holt & O'Farrell, Homer A. Holt, Thomas N. Chambers,* for appellee.

BROWNING, JUDGE:

This is an appeal from a final order of the Circuit Court of Kanawha County entered on April 8, 1968, in an appeal by Bethlehem Mines Corporation, appellee herein, from an administrative decision of G. Thomas Battle, Tax Commissioner of the State of West Virginia, predecessor to Charles H. Haden, II, appellant herein. In that final order that court expunged, voided and held for naught an assessment of Business and Occupation Tax and penalty made by appellant against appellee. This Court granted the appeal and supersedeas on March 24, 1969. All of the statutory references in this opinion are to sections of Chapter 11, Article 13, of the Code of West Virginia, as amended.

On March 16, 1965, appellant, under Code, 11-13-7, as amended, issued an assessment of Business and Occupation Tax for the years 1960 through 1964 against appellee, hereinafter sometimes referred to as Taxpayer, in the sum of $722,582.90 with a penalty thereon of $250,370.43, for a total of $972,953.33. During the assessment period Taxpayer was a wholly-owned subsidiary of Bethlehem Steel Corporation, hereinafter sometimes referred to as Parent Company. Among other such subsidiaries of Parent Company during that time were Bethlehem Steel Company, hereinafter sometimes referred to as Manufacturing Company, and Bethlehem Minerals Company, hereinafter sometimes referred to as Mining Company. During this period each member of Taxpayer's board of directors was also a director of Mining Company, Manufacturing Company and Parent Company. Also, each officer of Taxpayer was an officer in one or more of the other companies. Appellee here is the suc-

cessor to a December 31, 1964, merger in which Taxpayer and Mining Company merged to form Bethlehem Mines Corporation. The assessment period in question is prior to that merger.

During the assessment period Parent Company owned or leased the following coal properties in West Virginia: Marion Division Mines at Barrackville and Idamay, producing coal from the Pittsburgh seam; a Barbour Division mine at Century, producing coal from the Redstone seam; and, until November 10, 1961, a Randolph Division mine at Golden Ridge, producing coal from the Sewell seam. The Parent Company leased and subleased these mines to the Mining Company.

On March 1, 1955, the Mining Company and the Taxpayer entered into a contract, entitled "Operating Agreement," which is, as summarized by appellee, as follows:

A. *Recitals*

    (1)  Mining Company subleased coal lands from the Parent Company.

    (2)  The Mining Company bought plant and equipment.

    (3)  The Mining Company desired to employ the Taxpayer to manage the operation of the coal properties.

B. *Agreements*

    (1)  *The Undertaking*—The Mining Company employed the taxpayer to manage the operation of the coal properties; to "handle for" it all leases relating to extracting coal and to "handle for" it all leases of dwellings or structures.

    (2)  *The Term*—The agreement was to December 31, 1955, and from year to year thereafter, terminable on thirty days' notice.

    (3)  *Production of Coal*

        (a)  The Mining Company was to indicate the quantities and grades of coal that it

desired to have produced and shipped, the mines to be operated, the schedules and dates and places of delivery.

(b) The taxpayer was to purchase all tools, supplies, materials and stores and to employ such labor and technical assistance as should be necessary for the proper conduct of mining operations, and, when approved by the Mining Company to purchase necessary equipment.

(c) All costs of operations referred to in item (3) (b) above, were to be paid by the Mining Company or reimbursed to Taxpayer by the Mining Company in accordance with accounts maintained by the Taxpayer.

(4) *Title*—All coal to be mined, while in place and after extraction, remained the property of the Mining Company.

(5) *Sales—Profit or Loss*—The Mining Company had agreed to sell to Manufacturing Company at market prices all coal produced which Manufacturing Company desired; excess quantities were to be sold by the Mining Company.

(6) *The Compensation*—The Mining Company agreed to pay to the Taxpayer as compensation for its services in managing the operation of the coal properties under the agreement a fee at the rate of three cents ($3¢$) per gross ton on all coal shipped by or on the order of the Mining Company up to but not exceeding 2,000,000 tons in any calendar year, and on any additional tonnage to pay to the Taxpayer a fee at the rate of one and one-half cents ($1½¢$) per gross ton, and in any event the Mining Company was to pay to the Taxpayer a minimum compensation of $1,500.00 a month.

This contract continued in effect until the aforementioned merger. It is with respect to Taxpayer's activities under this contract that the instant controversy has arisen.

Under the "Operating Agreement," Parent Company leased coal properties to Mining Company. Parent Company paid Business and Occupation Tax on its royalties. Mining Company produced the coal and sold it to Manufacturing Company. Mining Company paid Business and Occupation Tax upon its production for the years in question in a total of $1,459,016, that amount representing the tax on the gross income derived from the production of coal under Code, 11-13-2a, as amended. Taxpayer managed the operation of the coal properties for Mining Company for a fee pursuant to the contract. During the period in question, Taxpayer received annual fees ranging in amounts from $68,189 to $77,890, upon which it paid Business and Occupation Tax in the total amount of $3,613.60. The total amount of fees received by Taxpayer was $357,906.88. It filed Business and Occupation Tax Returns with the Tax Commissioner each year on which it reported the gross receipts derived from the fee income and other miscellaneous items. The appellant's assessment reclassified this fee income from "rents and royalties" under Code, 11-13-2i, as amended, to "service" under Code, 11-13-2h, as amended, and thus increased the gross income by the full amount of the operating expenses of mining, stating that such expenses for which taxpayer was reimbursed were includable in gross income. The amounts of operating expenses added to Taxpayer's income are as follows:

| Year | Amount |
|------|--------|
| 1960 | $14,995,921 |
| 1961 | 13,211,402 |
| 1962 | 12,923,016 |
| 1963 | 13,027,521 |
| 1964 | 14,659,559 |
| TOTAL | $68,817,419 |

These operating expenses were composed of the expense or cost of materials, repairs and operations, hereinafter sometimes referred to collectively as M.R.O. items. Purchases of supplies and services were made and processed in the following manner: (1) A purchase requisition for

the particular M.R.O. item originated at the mine. (2) Pursuant to the requisition a purchase order was issued to the suppliers by personnel of the Manufacturing Company from its plant in Johnstown, Pennsylvania. On these purchase orders, Taxpayer is designated as that member of the Bethlehem Companies which is the buyer. (3) The suppliers were furnished invoice forms headed "Subsidiary Companies of Bethlehem Steel Corporation," complete with billing instructions. Over ninety percent of all invoices received were made out to "Subsidiary Companies of Bethlehem Steel Corporation" or to Bethlehem Steel Corporation. The remaining portion was billed directly to Taxpayer. Billing instructions directed that all invoices be sent to "Subsidiary Companies of Bethlehem Steel Corporation," Bethlehem, Pennsylvania, for payment. (4) Operating expenses, including purchases and payroll, were paid by Manufacturing Company, which received the invoice, consolidated it with other invoices received from the same supplier during each month for the various subsidiary companies, and issued a single check in payment therefor drawn on a bank account in the name of "Subsidiary Companies of Bethlehem Steel Corporation."

Manufacturing Company paid the expenses incurred by most of the subsidiaries, including those of Taxpayer and Mining Company. The costs incurred and paid were then distributed to and among the various subsidiaries.

The M.R.O. items of the mines were recorded by Taxpayer in a set of books called "mine ledgers" which was kept at the mines. Separate ledgers were maintained for each of Taxpayer's mining divisions. At the end of each month entries were prepared by appropriate journal vouchers to set up the aggregate of the operating expenses for the month on the mine ledgers. Purchases made and payable expenditures were reflected by debiting "Inventories Account No. 9804-100." The operating expenses were segregated in sub-accounts under the inventories account. General expense and repair sub-

accounts maintained under the inventories account were closed out to principal operating expense sub-accounts under the inventories account. These sub-accounts were kept separate for each mine.

It must be here noted that all figures used in the exhibits in the proceeding below were hypothetical and used solely for illustrating the accounting procedures involved. These same hypothetical examples will be used descriptively in the following narrative.

Journal Voucher No. 2, which was Exhibit 17 in the proceeding below, reflected the aggregate mining costs entered on Journal Voucher Nos. 2, 3, 4, 5, 6, 8, and 10, which were charged or debited to Inventories Account No. 9804-100:

| Journal Voucher No. | For | Amount |
| --- | --- | --- |
| 2 | Distribution of payroll | $100,000 |
| 3 | Distribution of wages paid from Home Office | 10,000 |
| 4 | Distribution of accounts payable paid by Manufacturing Company | 90,000 |
| 5 | General Expense | 1,700 |
| 6 | Distribution of petty cash disbursements | 200 |
| 8 | Provision for property taxes, pensions and insurance paid by Manufacturing Company | 6,000 |
| 10 | Expense incurred by Johnstown Division for Marion Division (Transfer of Johnstown Division overhead expense) | 4,000 |
| | Total operational mining costs charged or debited to Inventories Account No. 9804-100 | $211,900 |

These amounts were then balanced on the mine ledger books by corresponding credits to Inter-Company Balances Account No. 9809-210. After the operating ex-

penses were thus accumulated in the inventories account, the entries were reversed on the mine ledger books by an entry which debited the above-mentioned Inter-Company Balances Account and credited the above-mentioned Inventories Account with the same amount. In the hypothetical example, Journal Voucher No. 11, Inventories Account No. 9804-100 was closed out by being credited with the sum of $211,900 with which it was originally debited by the journal entries above described, and Inter-Company Balances Account No. 9809-210 was debited in the same amount.

The mining expenses involved in the aforementioned procedure included payroll, supervisory wages, materials, supplies, services, Workmen's Compensation and ad valorem property taxes. Payments to the United Mine Workers' Welfare Fund were not reflected in the inventories account, but instead were shown in Mine Ledger Account No. 9815-936, entitled "Provision for Welfare Fund." Payment was made by Manufacturing Company to the fund and the payment was recorded by Taxpayer in Journal Voucher No. 11. A further entry was made in that journal to close out the Provision for Welfare Fund Account and to charge the Inter-Company Balances Account. The mine ledger books, as hypothetically shown by Exhibit 17, reflect M.R.O. costs for the month charged to Inter-Company Balances Account No. 9809-210 in the sum of $231,900, composed of the $211,900 closed out from Inventories Account No. 9804-100, and $20,000 closed out from Provision for Welfare Fund Account, both to Inter-Company Balances.

Another set of Taxpayer's books was maintained in Johnstown, Pennsylvania. Taxpayer's share of the administrative office expense incurred at the Johnstown office was entered on these Johnstown ledgers. For example, Journal Voucher No. 1, Exhibit 21 below, showed debits to General Expense sub-account No. 6230 of the aforementioned inventories account and credits to the aforementioned Inter-Company Balances Account in the

amount of $4,000 for "Distribution of payroll and accounts payable for Johnstown office expense." This same entry was made in Journal Voucher No. 10 wherein General Mines Expense sub-account No. 6230 of the inventories account was debited in the amount of $4,000 for "Expense incurred by Johnstown Division for this division. (Transfer of Johnstown Division overhead expense)." The Johnstown expense for the month for the Marion Division in the sum of $4,000 was thus transferred to its mine ledger books by Taxpayer as an element of its total operating costs.

In addition to all these books, Taxpayer maintained a third set of books as its general ledger which contained entries of net profit or loss and federal and state taxes. The M.R.O. expenses entered on the other books were not reflected on the Taxpayer's general ledger books nor were they shown in its profit and loss statements. General Ledger Reference No. 1, Exhibit 23 below, debited the aforementioned Inter-Company Balances Account and credited Profit and Loss Account No. 9825 in the sum of $1,500 for "Operating fee," General Ledger Reference No. 2, again Exhibit 23 below, debited the profit and loss account and credited the Inter-Company Balances Account in the amount of $800 for "Federal and State Taxes." This sum was deducted from the operating fee of $1,500, leaving a balance of $700 as net profit to the Taxpayer from its operation of the West Virginia mines. Taxpayer then transferred the $700 to Parent Company in General Ledger Reference No. 5, wherein Bethlehem Steel Corporation Account No. 9809-311 was debited and Inter-Company Balances—Home Office Account No. 9809-100 credited in the amount of $700 for "closing out home office account to Bethlehem Steel Corporation to reflect net change since January 1, in amount receivable from the corporation." Also in Exhibit 23, General Ledger Reference X, "Cash Report," debited Works Ledger Control—Coal Division Account No. 9835-100 and credited Inter-Company Balances—Home Office Account No. 9809-100 in the sum of $5,000 for "Transfer of Bethlehem Steel

Company Cash to Marion Division." General Ledger Reference No. 3 debited Inter-Company Balances—Plant Account No. 9809-210 and credited Works Ledger Control —Coal Division Account No. 9835-100 in the same amount for "Transferring inter-company balances to Home Office." General Ledger Reference No. 4 debited Inter-Company Balances—Home Office Account No. 9809-100 and credited Inter-Company Balances—Plant Account No. 9809-210 in the amount of $5,700 for "Transferring balance in plant account to home office." The $700 is the net profit hereinbefore referred to. The remaining $5,000 is the same sum entered on Journal Voucher No. 5, wherein Account No. 9801-210 is debited and credited and Works Ledger Control Account No. 9835-100 is credited in that amount for "distribution of Cashier's Cash" as part of the operational mining expenses. The $5,000 is composed of entries reflecting expenditures accounted for as follows:

$1,700    General Expense sub-account No. 6000 of Inventories Account No. 9804-100 was debited and Works Ledger Control Account No. 9835-100 was credited. Inter-Company Balances Account No. 9809-210 was credited in this amount.

$200    General Expense sub-account No. 6000 of Inventories Account No. 9804-100 was debited and accounts payable-Public Account No. 9812-100 and Works Ledger Control Account No. 9835-100 were credited for distribution of petty cash disbursements. Inter-Company Balances Account No. 9809-210 was credited in this amount.

$1,700    Inter-Company Balances Account No. 9809-210 was debited and Account No. 9812-925 was credited, for distribution of payroll deductions (garnished wages).

$1,400    Inter-Company Balances Account No. 9809-210 was debited and Account No. 9816-700 was credited for transferring provision for Workmen's Compensation liability to Manufacturing Company.

Also, this $5,000 is a portion of a $9,000 amount which was debited to Works Ledger Control Account No. 9835-

100 and credited to Inter-Company Balances Account No. 9809-210 in Journal Voucher No. 12, Exhibit 17 below. The balance, $4,000, is the identical sum attributable to administrative expense of the Johnstown division entered in the aforementioned Journal Voucher No. 10, and was debited to General Mines Expense sub-account No. 6230 of Inventories Account No. 9804-100 and credited to Works Ledger Control Account No. 9835-100 and, along with the other items of mine operating expenses, to Inter-Company Balances Account No. 9809-210.

As shown above, Taxpayer closed out the M.R.O. costs in the sum of $231,900 by crediting the inventories account and welfare fund account and by debiting the Inter-Company Balances Account. The entry was made in Taxpayer's mine ledger, Journal Voucher No. 11, for "Transferring operating expense, etc. to Bethlehem Minerals Company—Coal." At the same time Mining Company made a corresponding entry on its books. Journal Voucher No. 1, Exhibit 19 below, Inventories Account No. 9804-100 and Coal-Marion Division Account No. 2916-802 were debited and Inter-Company Balances Account No. 9809-210 was credited in the amount of $231,900 for "transferring operating expense and sundry provisions from Bethlehem Mines Corporation—Marion Division."

In addition to the $231,900 M.R.O. expenses, Mining Company's books reflect the expense of Taxpayer's fee. Journal Voucher No. 2 debited the inventories account and Coal-Marion Division Account No. 2916-002 and credited the Inter-Company Balances account in the amount of $1,500 for "Operating fee of Bethlehem Mines Corporation." Thus, the sum of $233,400 became the total operational mining expenses reflected in Mining Company's books, i.e., in Journal Voucher No. 4, Profit and Loss Account No. 9825 was debited and the inventories account was credited in that amount for "Closing cost to profit and loss."

Mining Company sold the coal produced for it by Taxpayer to Manufacturing Company. In Journal Voucher

No. 3, the inter-company balances account was debited and the profit and loss account was credited in the amount of $400,000 for "sale of coal to Bethlehem Steel Company." Mining Company's net profit of $166,600 is found by subtracting the costs of the mining operation, $233,400, from the sale price of the coal, $400,000. This net profit of Mining Company was transferred to Parent Company in Journal Voucher No. 5 wherein Bethlehem Steel Corporation Account No. 9809-311 was debited and the inter-company balances account credited in the amount of $166,600 for "Closing out Inter-company balances to Bethlehem Steel Corporation to reflect net change since January 1 in indebtedness to that corporation."

The payment of the expenses of Manufacturing Company and the closing out of its inter-company balances to Parent Company were reflected in "Bethlehem Steel Company Cash Book," Exhibit 25 in the proceeding below. Total expenses of $232,700 were shown by debiting the inter-company balances account and crediting Cash Account No. 9801-100 for "Payment of amounts listed below as shown on division and general ledgers of Bethlehem Mines Corporation and Bethlehem Minerals Company." These are the amounts referred to:

| ITEM | AMOUNT |
|---|---|
| 1.  PAYROLL—Marion Division | $ 98,300 |

Note:  J. V. No. 1 is in the amount of $100,000 for payment of wages by Manufacturing Company

Note:  J. V. No. 7 is in the amount of ................ $ 3,100, $1,700 whereof is for distribu-  ($1,700) tion of payroll deductions (garnished wages), being that portion of the total payroll of $100,000 devoted to the satisfaction of garnishments and deductible therefrom, leaving a balance of ............... $ 98,300

2. ACCOUNTS PAYABLE—
Marion Division

Note: J. V. No. 4 is in the amount of ____$110,000
for distribution of accounts
payable paid by Manufac-
turing Company.

Note: J. V. No. 7 as indicated in
Item 1 above, is in the total
amount of $3,100. The
amount of $1,400 remaining _____$ 1,400
(after deduction of $1,700,
noted in Item 1 above) is for
transferring provision for
Workmen's Compensation li-
ability to Manufacturing
Company and, as such, con-
stitutes a deduction from the
$110,000 sum of accounts pay-
able attributable to Tax-
payer's Marion Division _____$108,600

3. HOME OFFICE PAYROLL—
Marion Division _____   $ 10,000

Note: J. V. No. 3 is in the amount of
$10,000 for distribution of
wages paid from the home
office. (Certain salaried super-
visory personnel of Tax-
payer were paid through the
Bethlehem, Pennsylvania,
offices of Manufacturing
Company.

4. PROPERTY TAXES, PENSIONS
AND INSURANCE—
Marion Division _____   $ 6,000

Note: J. V. No. 9 is in the amount
of $6,000 for provisions for
property taxes, pensions and
insurance paid by Manufac-
turing Company.

5. TRANSFER OF CASH TO
MARION DIVISION
(CASH REPORT) _____   $ 5,000

Note: Said sum of $5,000 is credited
to Works Ledger Control Ac-
count No. 9835-100 $5,000 and

is part of the $9,000 credited to that account, $4,000 whereof, as Johnstown office expense (see Item 7 below), is entered on Exhibit 17, J. V. No. 10 and debited to that account and credited to Inter-Company Balances on Exhibit 17, J. V. No. 12. The amount of $1,700 deducted from payroll (Item 1 above) and the amount of $1,400 deducted from accounts payable (Item 2 above) are included within this sum of $5,000.

6. BETHLEHEM MINES COMPANY (TAXPAYER) FEDERAL AND STATE TAXES . ..    ........     $    800

Note: Exhibit 23, Gen. Ledger Ref. No. 2 is in the amount of $800 for Federal and state taxes.

7. JOHNSTOWN DIVISION OFFICE EXPENSE ... ....  ..... ......     $  4,000

Note: This sum is for distribution of payroll and accounts payable for Johnstown office expense. Said sum is credited to Works Ledger Control Account No. 9835-100 and is the proportionate share of Johnstown office expense, bookkeeping, etc. attributable to the Marion Division and is ultimately debited to Inter-Company Balances. Said sum is a portion of the amount of $9,000 referred to in Item 5 above, which is credited to Works Ledger Control Account No. 9835-100.

TOTAL ................................................     $232,700

Manufacturing Company's General Ledger Reference No. 1 debited Inventories Account No. 9804-100 and credited Inter-Company Balances Account No. 9809-210 in the

amount of $400,000 for "Purchase of Coal from Bethlehem Minerals Company." A corresponding entry was made in Mining Company's Journal Voucher No. 3. In General Ledger Reference No. 2, the inter-company balances account was debited and Bethlehem Steel Corporation Account No. 9809-311 credited in the amount of $167,300 for "Closing out inter-company balances to Bethlehem Steel Corporation to reflect net change since January 1 in indebtedness to that corporation." This figure is Manufacturing Company's net profit determined by subtracting its costs, $232,700, from the value of the coal purchased from Mining Company, $400,000. Manufacturing Company then transferred the $167,300 to Parent Company in General Ledger Reference No. 2. This amount, then, was the ultimate net profit realized by Parent Company from the coal produced and purchased through the inter-company transaction conducted by its subsidiaries. The amount was then added to the original $1,000,000 which was the basis for the acquisition of the coal involved.

During the period in question, Taxpayer reported the following gross income to appellant and paid the following Business and Occupation Tax:

| YEAR | GROSS INCOME | | CLASSIFICATION PER RETURN | TAX PAID |
|------|--------------|---|---------------------------|----------|
| 1960 | $ 74,758.16 | 1 | (Rents-Royalties) | $ 736.56 |
|      | 319.52 | cl | (Retailers) | |
| 1961 | 70,694.13 | 1 | (Rents-Royalties) | 694.74 |
|      | 490.95 | cl | (Retailers) | |
| 1962 | 69,208.99 | 1 | (Rents-Royalties) | 694.03 |
|      | 3,467.48 | cl | (Retailers) | |
| 1963 | 71,801.14 | 1 | (Rents-Royalties) | 706.47 |
|      | 512.76 | cl | (Retailers) | |
| 1964 | 78,873.11 | | (Rents-Royalties) | 781.80 |
|      | 726.75 | cl | (Retailers) | |
| TOTAL | $370,852.99 | | | $3,613.60 |

Appellant assigns the following errors relied upon for reversal by this Court:

(1) That the circuit court erred in ruling that Paragraph 21 of the Stipulation between the parties was relevant, material and admissible evidence in the cause, and in overruling appellant's objections thereto, and in denying appellant's motions that the court rehear and reconsider its rulings thereon, sustain appellant's objections thereto, and exclude the objected to evidence, which was the following:

21. During the years 1960-1964, each member of the Taxpayer's board of directors was also a director of the Mining Company, the Manufacturing Company and the Parent Company. Each officer of the Taxpayer was also an officer of one or more of the Mining Company, Manufacturing Company and the Parent Company. Attached hereto as Exhibit 37, is a schedule of official position held by officers and attached hereto as Exhibit 38 is a schedule of directors of the Taxpayer showing the positions held in the other named companies.

(2) That the circuit court erred in ruling that Paragraph 23 of the Stipulation and Exhibits 40, 41 and 42 were irrelevant, immaterial and inadmissible evidence in the cause, and in sustaining appellee's objections thereto, and in denying appellant's motions to rehear and reconsider the ruling thereon, overrule appellee's objections, and admit the evidence, which was:

23. In the years 1961 and 1964, the Taxpayer joined in consolidated Federal income tax returns filed by the Parent Company and affiliated companies. In each of the years 1960, 1962 and 1963, the Taxpayer filed separate Federal income tax returns. A copy of the 1962 Federal income tax return filed with the Internal Revenue Service by the Taxpayer is attached hereto as Exhibit 40. The 1960 and 1963 Federal Income tax returns filed by the Taxpayer were prepared in a similar manner. Prepared therewith and attached thereto are Exhibit 41 designated a "Re-

conciliation of Items Per Books to Items Per Federal Tax Return—1962—Gross Income" and Exhibit 42 designated as a "Reconciliation of Net Income Per Book P & L to Taxable Income—Year 1962." Similar reconciliation statements were prepared in 1960 and 1963. Upon audit of the Mining Company's 1960 Federal income tax return certain repair expenses of the Marion Division and Barbour Division in the aggregate amount of $34,766 were disallowed as deductions by the Internal Revenue Service and treated as capital expenditures. No adjustment was made with respect to the tax return of the Taxpayer.

(3) That the circuit court erred in ruling that each of Paragraph 25 of the Stipulation and Exhibits 43 and 44 were relevant, material and admissible evidence, and in overruling appellant's objections thereto, and denying appellant's motions to rehear and reconsider the rulings thereon, sustain appellant's objections thereto, and exclude the evidence, which was:

25. The Taxpayer has acted under agreements similar to the Operating Agreement dated March 1, 1955 (Exhibit 1) with various Bethlehem companies since at least 1936. It has regularly filed business and occupation tax returns with the State Tax Commissioner reporting its fee income but not reporting operating expenses, at issue here. The business and occupation tax returns of the Taxpayer for the year 1955, was audited by the field auditor of the State Tax Commissioner, R. H. Moyers, on or about September 19, 1956. Taxpayer's returns was [sic] accepted as filed. A file memorandum relating to such audit is attached as Exhibit 43. A copy of a letter addressed to Bethlehem Steel Corporation dated October 15, 1956, by the State Tax Commissioner is attached hereto as Exhibit 44.

(4) That the circuit court erred in ruling that Paragraph 26 of the Stipulation and Exhibits 45, 46, 47 and 48 were relevant, material and admissible evidence, and in overruling appellant's objections thereto, and in denying appellant's motions to rehear and reconsider the rul-

ings thereon, sustain appellant's objections thereto, and exclude the evidence, which was:

26. Indian Coal Company, a wholly owned subsidiary of Mining Company, by letter dated September 23, 1955 attached hereto as Exhibit 45, requested from the State Tax Commissioner a refund of business and occupation taxes due to the erroneous inclusion in income reported of certain "reimbursable costs." This claim was enlarged by letter dated October 25, 1955, attached as Exhibit 46, and allowed by the Tax Commissioner by letters dated December 5, 1955, and December 27, 1955, attached as Exhibits 47 and 48 respectively.

(5) That the circuit court erred in ruling that Exhibits 51 and 52, offered into evidence by appellee, were relevant, material and admissible evidence and in overruling appellant's objections thereto and in denying appellant's motions to rehear and reconsider the rulings thereon, sustain appellant's objections thereto and exclude the Exhibits from the evidence. These two exhibits were letters, Exhibit 51 being a cover letter dated March 1, 1955, from B. D. Broeker, assistant to the vice president, to R. H. Gray, assistant comptroller, for copies of documents relating to West Virginia coal property; and Exhibit 52 being a letter dated March 10, 1955, from Broeker to R. H. Schlottman, vice president, which told the latter, *inter alia,* that Taxpayer had taken over as "operating agent" for Mining Company.

(6) That the circuit court erred in entering the aforementioned judgment below.

(7) That the circuit court erred in denying appellant's motions to set aside and vacate the judgment, and rehear and reconsider its decision and upon rehearing to affirm the assessment and penalty, and to award judgment for the appellant.

The Circuit Court of Kanawha County found that the agreement between the Mining Company and the Taxpayer clearly established the status of principal and

independent contractor. Counsel for the appellant, citing numerous decisions of this Court in support of the circuit court's holding that the Taxpayer was an independent contractor, contend that this Taxpayer falls within the definition of "service business" as defined in Section 2h and further contend that the definition of the phrase "service business or calling" as defined in Section 1 clearly applies to this Taxpayer. Section 2h is short and is here quoted in full: "Upon every person engaging or continuing within this State in any service business or calling not otherwise specifically taxed under this law, there is likewise hereby levied and shall be collected a tax equal to one and five one-hundredths per cent of the gross income of any such business." Section 1 defines service business as follows:

> "Service business or calling" shall include all nonprofessional activities engaged in for other persons for a consideration, which involve the rendering of a service as distinguished from the sale of tangible property, but shall not include the services rendered by an employee to his employer. This term shall include persons engaged in manufacturing, compounding or preparing for sale, profit, or commercial use, articles, substances, or commodities which are owned by another or others, as well as persons engaged as independent contractors in producing natural resource products for persons required to pay the tax imposed by section two-a [§11-13-2a] of this article.

The rule that has been consistently followed by this Court is clearly stated in *Greaser* v. *Oil Company,* 109 W. Va. 396, 155 S. E. 170. This is the only syllabus point of that case: "The test of the relation between one having work done and the workman consists in the employer's right or lack of right to supervise the work. If that right exists, the relation is that of master and servant. If that right does not exist, the relation is that of employer and independent contractor." Furthermore, this is the seventh syllabus point of *Brewer* v. *Appalachian Constructors, Inc., et al.,* 138 W. Va. 437, 76 S. E.2d 916:

"The test of the relationship of master and servant is the right to control the alleged servant's activities, and not the exercise of control." In the even more recent case of *Davis* v. *Fire Creek Fuel Company*, 144 W. Va. 537, 109 S. E.2d 144, this is a partial quotation from the fifth syllabus point thereof: "[T]he most important element is the right or power of direction and control of the manner in which the work is to be performed." There are many other decisions of this Court to the same effect, some of which are cited in the opinions of the aforementioned cases. We are of the view that the circuit court correctly held that the relationship of principal and independent contractor did exist between the Mining Company and Taxpayer by virtue of the provisions of the agreement and the manner in which it was executed as particularized hereinbefore. However, we are of the view that the relationship between the parties is not the controlling issue in this case. The Business and Occupation Tax is not an income tax. It is a tax upon the privilege of doing business in this State. However, by Section 1, it is clear that the measure of the tax is the "gross income" of the Taxpayer "received as compensation for personal services and the gross receipts . . . derived from trade, business, commerce or sales. . . ." Even if we find, as counsel for the appellant have so ably argued in their brief, that this Taxpayer falls within the definition of "service business or calling" as defined in Section 1 and is an independent contractor engaged "in producing natural resource products for persons required to pay the tax imposed by section two-a of this article," that is not sufficient to make this Taxpayer liable for the payment of taxes under the service section upon the "operating expenses" of sixty-eight million dollars plus during the five years in question. The precise issue before the circuit court and before this Court is whether those expenditures by the Taxpayer and the receipt of that amount of money as reimbursement from the other party to the contract, the Mining Company, constitutes

"gross income" within the definition contained in Section 1.

It is not contended by counsel for the appellant that the Mining Company would have been required under the statute to pay a Business and Occupation Tax on that sixty-eight million dollars plus if it had "managed" its mines in this State and had not entered into an agreement with the Taxpayer to do so. It is obvious that the Taxpayer could not have paid these expenses from the comparatively small "fees" which it received for its services. The amount received by the Taxpayer for its services amounted to $357,906.88 whereas the operating expenses amounted to sixty-eight million dollars plus. To repeat, there is no contention that if Mining Company had managed its own mines, as it is now doing according to the record, the sixty-eight-million-dollar plus expenditures could by any interpretation of any provision of Article 13 be considered gross income. Furthermore, it is the view of this Court that no provision of that article makes the reimbursement to the Taxpayer of those expenditures as provided by the agreement "gross income" or any other kind of income. It is true that Section 1 provides that "gross income" means "the gross receipts of the taxpayer . . . without any deductions on account of the cost of property sold, the cost of materials used, labor costs, taxes, royalties, interest or discount paid or any other expense whatsoever." This Taxpayer paid its Business and Occupation Tax upon its entire income without making any deduction for any "expense whatsoever." The companies have now merged and there is no Taxpayer acting as agent for the Mining Company. This Taxpayer was during the years in question paying Business and Occupation Taxes upon payments received from Mining Company for services rendered. Those amounts ranged as heretofore stated from $68,189 to $78,890 during the years in question. Now, of course, no such taxes are being paid.

This Court is of the opinion that the circuit court was

right both in its finding that a principal and independent contractor relationship existed between the parties to the agreement and in its finding that the sums paid to the Taxpayer by the Mining Company, as provided by the agreement for reimbursement for expenditures during the years in question, did not constitute "gross income" as defined by Section 1. Inasmuch as it is the view of this Court that the pertinent provisions of the agreement and the pertinent provisions of Chapter 11, Article 13, are clear and unambiguous, we have not specifically discussed the assignments of error relating to the admission or rejection of evidence by the circuit court as questions of law alone are determinative of the primary issue herein and we consider any error that may have been committed with regard to admission or rejection of evidence as harmless. Therefore, the judgment of the Circuit Court of Kanawha County is affirmed.

*Affirmed.*