544 S.E.2d 79

**RGIS INVENTORY SPECIALISTS, a Michigan co-partnership, Plaintiff below, Appellee,**

v.

**Joseph M. PALMER, III, State Tax Commissioner, Defendant below, Appellant.**

No. 28212.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 10, 2001.

Decided Feb. 22, 2001.

Michael E. Caryl, Esq., Bowles, Rice, McDavid, Graff & Love, Martinsburg, West Virginia, Attorney for Appellee.

Darrell V. McGraw, Esq., Attorney General, Stephen B. Stockton, Esq., Assistant Attorney General, Charleston, West Virginia, Attorneys for Appellant.

STARCHER, Justice:

The appellee, RGIS Inventory Specialists, Inc. ("RGIS"), challenges a ruling by appellant, Joseph M. Palmer, State Tax Commissioner of the State of West Virginia ("the Commissioner"), holding that inventory services provided by the appellant are subject to the state sales tax. We hold that certain inventory services do not fall under an "electronic data processing" exemption to the state sales tax.

I.

*Facts & Background*

RGIS is based in Rochester, Michigan, with field offices located throughout the United States, including in Charleston and Huntington, West Virginia. "RGIS" stands for "Retail Grocery Inventory Services." RGIS is a national, multi-million dollar company that provides independent inventory services for thousands of businesses—not just grocery stores.

RGIS describes its services as either "audit inventories" or "financial inventories"—audit inventories identify more inventory characteristics. Financial inventories can be completed at RGIS field offices; audit inventories, because of their greater complexity, generally require transmittal of inventory data to RGIS's Michigan headquarters for final processing.

To conduct an inventory, RGIS employees go to a customer's site and visually observe the customer's inventory of goods. The customer has initially provided RGIS with information about the customer's inventory, from which RGIS creates an electronic template or format for the inventory. RGIS employees enter information about the observed goods (number, type, color, size, etc.) into a hand-held or belt-mounted minicomputer, into which the customer's general inventory information has already been pre-loaded. Once the physical taking of the inventory is complete, RGIS arranges the collected inventory data in a format desired by the customer, and submits the information in that form to the customer.

The instant case began as an administrative appeal by RGIS from an assessment by the Commissioner for sales tax on RGIS's business activity in West Virginia—in the amount of $320,394.00 in tax and $63,824.00 in interest—for a total assessment of $384,218.00. In an Administrative Decision issued on March 31, 1999, the Commissioner affirmed the assessment, and held that RGIS's services were not "data processing services" that are exempt from West Virginia sales tax.

*W.Va.Code,* 11–15–9(a)(22) [1997] [1], states:

1. At the time the sales tax that is at issue in the instant case was assessed, this statutory language

[The following sales and services are exempt from sales tax:]

\* \* \*

Sales of electronic data processing services and related software: Provided, That for the purposes of this subsection "electronic data processing services" means: (1) The processing of another's data, including all processes incident to processing of data such as keypunching, keystroke verification, rearranging or sorting of previously documented data for the purpose of data entry or automatic processing and changing the medium on which data is sorted, whether these processes are done by the same person or several persons; and (2) providing access to computer equipment for the purpose of processing data or examining or acquiring data stored in or accessible to such computer equipment[.]

This statutory language is repeated and explained at 110 C.S.R. 15, Sec. 76, which states:

§ 110–15–76. *Electronic Data Processing Services and Related Software.*

76.1 Sales of electronic data processing services and related software to others are exempt from consumers sales and service tax and/or use tax. For the purposes of this exemption, electronic data processing services means (1) the processing of another's data, including all processing such as key punching, keystroke verification, rearranging, or sorting of previously documented data for the purpose of data entry or automatic processing, and changing the medium on which data is sorted; and (2) providing access to computer equipment for the purpose of processing data or examining or acquiring data stored in or accessible to such computer equipment.

76.1.1 It is necessary to determine the nature of what is being purchased by the customer. For example, where a completely computerized billing service actually prints and mails the bills based on information provided by the client, receives collectibles and records the payments received, the service is taxable. The fact that a computer is utilized does not result in the service being exempt.

76.1.2 The purchase by customers of specialized computer software which allows the customers terminals to communicate directly with a central processing unit of another is exempt if that is the only use of such software.

76.1.3 The purchase of other software which merely provides information to assist the customer in making business decisions is taxable.

76.2 Purchases for use in rendering electronic data processing services for others and the purchase of related software are taxable, except for purchases for resale, for which an exemption certificate may be issued.

RGIS appealed the Commissioner's Administrative Decision to the Circuit Court of Cabell County. The circuit court reversed the Commissioner, on the grounds that RGIS performs "electronic data processing services" that are exempt from sales tax. The Commissioner then brought the instant appeal to this Court from the decision of the circuit court.

## II.

### Standard of Review

■ We apply a *de novo* standard of review to the circuit court's decision, because that decision interpreted and applied the law to undisputed facts.

## III.

### Discussion

### A.

### Underlying Principles

We begin our discussion by setting forth some underlying principles that must guide our approach to the issues presented by the instant case.

■ This Court has repeatedly held—recently in Syllabus Point 4 of *Shawnee Bank, Inc. v. Paige,* 200 W.Va. 20, 488 S.E.2d 20 (1997)—that

was codified at *W.Va.Code,* 11–15–9(y) [1993].

We will use the current citation.

[w]here a person claims an exemption from a law imposing a license or tax, such law is strictly construed against the person claiming the exemption.

(Citations omitted.)

In the instant case, the foregoing principle of strict construction against exemption, as applied to the "electronic data processing" sales tax exemption, is reinforced by the fact that the Legislature has stated: "it shall be presumed that all sales and services are subject to the [sales] tax *until the contrary is clearly established.*" *W.Va.Code,* 11–15–6 [1987] (emphasis added). Moreover, the statutory scheme places the burden upon the taxpayer to establish that an "assessment is incorrect and contrary to law, either in whole or in part." *W.Va.Code,* 11–10–9 [1978].

Additionally, in the case of the electronic data processing exemption, the applicable legislative regulations that are quoted *supra* state that "[i]t is necessary to determine the nature of what is being purchased by the customer," and that "[t]he [mere] fact that a computer is utilized does not result in the service being exempt." 110 C.S.R. 15, § 76.1.1.

We can take judicial notice that in a modern business environment, some aspect of electronic data processing will very likely be a part of every commercial transaction. Thus, in the context of examining and applying an exemption that exempts "all processes incident to processing of data" (*W.Va.Code,* 11–15–9(a)(22) [1997] ), it becomes particularly necessary to determine "what is being purchased by the customer" (110 C.S.R. 15, § 76.1.1.) and what is "incident[al]" to such a purchase.

■ If what the customer is buying is not primarily electronic data processing, then activity that might otherwise be seen as "incidental" to such processing simply cannot qualify for the exemption. To interpret the exemption otherwise would be to exempt all parts of a transaction—if any part of the transaction, no matter how minimal, could be considered "electronic data processing." Put another way, to hold that because there is an element of electronic data processing in certain services, everything else is incidental to that element, would be contrary to the intention of the Legislature and inconsistent with the mandate that exemptions from sales tax are to be strictly construed against exemption.

**B.**

*The Commissioner's Position*

The following (slightly edited) excerpt from the Commissioner's brief before this Court sets forth the Commissioner's position and reasoning:

The bulk of the taxpayer's services constitutes data generation rather than data processing.

The Tax Commissioner has always been willing to admit that some of what Taxpayer [RGIS] does is processing of another's data, and therefore exempt from sales and use tax, if it could be shown that the data processing was more than incidental. Specifically, the Tax Commissioner would admit that everything past the point of data generation is data processing. However, Taxpayer has chosen to go with an "all or nothing" strategy, insisting that everything it does is either data processing or "incidental to" data processing. Taxpayer has consistently refused to provide any kind of allocation of costs and revenues between those functions the Tax Commissioner admits are data processing, and the taking of the physical inventory, which the Tax Commissioner contends is neither data processing nor incidental to data processing.

It cannot conceivably be the customer's primary goal in having Taxpayer conduct a physical inventory to determine that they have spaces for three varieties of canned beans, with respective UPC codes of 123, 456, and 789 in aisle five of their store at prices ranging from 34 cents to 58 cents a can. Any retailer with a continuous inventory system will already have that information. For inventory purposes, that information is essentially meaningless unless there are quantities associated with it. That quantity number is *the* essential piece of data that any retail store needs to know,

and it is that piece of data that Taxpayer's "inventory counters" *generate.*

(Emphasis in original.)

The series of ones and zeroes that represent a dozen cans of beans in a computer's memory are data. The numbers and words "12 cans of beans" written on a piece of paper are data. But a dozen cans of beans siting on a shelf are not "data", much less "previously documented data;" they are a dozen cans of beans. The act of recording the existence of those twelve cans of beans is an act of generating data where none existed before, and is by its very nature not processing of data.

(Emphasis added.)

\*       \*       \*

Taxpayer argues that the Tax Commissioner is neglecting other aspects of its operation, such as downloading of certain data from the customer's computers into Taxpayer's handhold minicomputers before the physical inventory is conducted. However, the downloading of this data (for example, customers' UPC and SKU codes) merely provides a template—a context into which the generated data is incorporated. Even if the process of downloading that admittedly "previously documented data" is characterized as data processing, it is incidental to the taking of the physical inventory, rather than the other way around. It facilitates the physical inventory, and, pursuant to the regulation's admonition to "determine the nature of what is being purchased by the customer," is not tax exempt data processing.

\*       \*       \*

Even if the words of the statute are liberally construed (contrary to the requirement that exemptions be narrowly construed) so that "keypunching" is synonymous with "data entry" the statute speaks of data entry only in the context of "rearranging or sorting of *previously documented* data for the purpose of data entry or automatic processing." W. Va.Code § 11–15–9(y) (emphasis added). The statute contemplates "data entry" as entry of "previously documented" data, rather than the act of creating data by converting a

mental impression into a digital bit by means of a keystroke.

(Emphasis in original.)

Taxpayer's testimony and briefs have assiduously characterized the taking of the physical inventory as data entry, but the data in this case does not exist until it is entered, and only then does it become "[n]umerical or other information presented in a form suitable for processing by computer." *See* American Heritage College Dictionary 353 (3d ed.1997) (in the context of computer science, "data" is defined as "[n]umerical or other information represented in a form suitable for processing by computer.") The keystroking involved in generating the data that Taxpayer later processes is neither keypunching nor data entry.

\*       \*       \*

Although Taxpayer's overall cost of mainframe and handheld computers is certainly substantial, the portion of that fixed cost that can be attributed to any one of the several hundred thousand inventories Taxpayer conducts each year is quite probably dwarfed by the cost of the labor involved on-site. Taxpayer could have addressed this point, but chose to maintain its "all or nothing" stance and refuse to allocate costs and revenues attributable to data processing and counting inventory.

## C.

### *RGIS's Position*

The position and reasoning that RGIS urges upon this Court is set forth in the following (slightly edited) excerpt from RGIS's brief:

[The] Tax Commissioner argues that the product unit quantity element of its customers' data does not exist prior to its observation and entry by the Taxpayer's personnel. He then leaps to the conclusion that such data cannot be said to be "previously documented" as the statute requires. Such a conclusion is erroneous for several compelling reasons.

First, the express language of the statute does not require that, to render tax-

exempt electronic data processing services, one must be processing data documented by another prior to the onset of those services. Specifically, the law provides that tax-exempt electronic data processing services means:

> ... (1) The processing of another's data, *including* all processes incident to the processing of data *such as* keypunching, keystroke verification, rearranging or sorting of *previously documented data* for the purpose of data entry *or* automatic processing and changing the medium on which data is sorted, *whether these processes are done by the same person or several persons ...*"

(Emphasis added.)

By the use of the term of enlargement "including" and of the term "such as" to introduce them, the "processes" specifically identified in the above-quoted language must be seen as a nonexclusive list of examples of tax-exempt processes which are incident to data processing. *State Human Rights Commission v. Pauley,* 158 W.Va. 495, 212 S.E.2d 77 (1975). Thus, because it is not a mandatory element of the exemption scheme, the purported absence of documentation of its customers' data prior to the onset of the Taxpayer's service cannot serve as the basis for denying their entitlement to the exemption.

Second, simple logic dictates that, as used in the quoted statutory language, the previous documentation of the subject data must itself also be seen as a process "incident to" the processing of such data. Further, the statute's language which immediately follows that reference expressly provides that it does not matter whether any such "processes are done by the same person or several persons." Thus, the application of the exemption does not turn on whether the previous documentation of the subject data is done by the same person who later processes it, or by others.

Third, as the foregoing dictionary definition of the term "data processing" states, "recording ... information by mechanical means ..." is data processing. *Webster's New World College Dictionary, supra,* at p. 352.

Fourth, in asserting that, until observed and entered, the customers' product unit quantity data does not exist, the Tax Commissioner overlooks the fact that the above-quoted common meaning of the term "data" includes "evidence." *See Webster's Unabridged Dictionary of the English Language* 369. When the term "evidence" is used in a legal context, it is defined to include "testimony, writings, material *objects,* or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." *See Black's Law Dictionary* 555 (6th Ed.1990). (Emphasis added).

Thus, each unit of product on a customer's shelves is data in the form of evidence of its existence, of the quantity of the same, and of the many other elements of data apparent from it, which data the Taxpayer's personnel enter into their microcomputers incident to the processing of the same.

(Emphasis added.)

The Tax Commissioner, in his brief, asserts that the Circuit Court's holding—which applies rather than interprets the governing statute—"flips the necessary analysis on its head." Rather, in the face of the statute's plain words, exempting from tax "... all processes incident to [electronic data] processing ...," it is the Tax Commissioner who is flipping the analysis by arguing that the Circuit Court should have found that all the Taxpayer's processing was incident to providing a taxable inventory counting service.

In so arguing, the Tax Commissioner is, in effect, attributing to the Legislature an intent to only exempt electronic data processing services where they are performed for their own sake and not to achieve some other ultimate purpose, such as maintaining a bank's customers' accounts, billing patients for health care providers, or independently measuring and confirming a retailer's inventory.

Nevertheless, in words too plain to permit interpretation, the Legislature exempted the electronic data processing of another's data, and all processes incident thereto, regardless of the particular con-

text or ultimate object or use of that processed data by the person engaging the electronic data processing service. Clearly, the ultimate result the Taxpayer's customers are seeking is a reliable report of their inventory data organized in a manner which meets their management needs. To obtain that result, they hire the Taxpayer to perform its electronic data processing service.

## D.

### Analysis

■ Having set forth the positions of the parties, we begin our analysis of the applicability of the "electronic data processing" exemption in the instant case by recognizing that the controlling statutory language unequivocally states that: " 'electronic data processing services' means: (1) The processing of *another*'s data." *W.Va.Code,* 11–5–9(a)(22) [1997] (emphasis added). Thus, the electronic data processing exemption applies only where one person (or entity) has data— and a separate person electronically processes the first or "other" person's data.

■ The questions then arise: what is the nature of the "data" that the first person has? And how does the first person "get" or "have" such "data," that can be subsequently processed?

A brief tour through several dictionaries reveals that the term "data" can be given such a wide range of meanings, in different contexts, that reliance on a specific dictionary definition is not much help in answering the questions before us.[2]

However, the statute itself is some help in understanding what the Legislature meant when it exempted the electronic processing of "another's data." Specifically, the statute says that inputting another's *"previously documented* data" *(W.Va.Code,* 11–15–9(a)(22)[1997] ) into an electronic system (for example, by keypunch, electronic reading, or diskette) falls within the electronic data processing exemption.

Thus, the statute contemplates that "data" is something that is initially "documented" in one form, and then may be processed into another form.[3] Put another way, the use of the phrase "previously documented" to modify "data" suggests that "data" (as used in the statute) means symbolic or representative information—like words, numbers, codes, or images—that "documents," stands for, or represents other, more primary items, facts, or information.

In the case of inventory services, such documentation would be accomplished by counting and recording information (number, color, size, etc.) about the physical objects in a customer's stock. The abstract or symbolic information that documents the relevant physical characteristics of a customer's stock, under this approach, would be that custom-

---

**2.** The *American Heritage College Dictionary* (1997), defines "data" as:
　1. Factual information, esp. information organized for analysis.
　2. *Comp. Sci.* Numerical or other information represented in a form suitable for processing by computer. 3. Values derived from scientific experiments.
*Webster's New World College Dictionary,* 3d Ed. (1997), defines "data" as: "facts or figures to be processed; evidence, records, statistics, etc. from which conclusions may be inferred; information."
　The *Random House Webster's Unabridged Dictionary,* Second Edition (1999), defines "data" as:
　individual facts, statistics, or items of information: *These data represent the results of our analyses. Data are entered by terminal for immediate processing by the computer.* 3. a body of facts; information: *Additional data is available from the president of the firm.*

— Usage. DATA is a plural of DATUM, which is originally a Latin noun meaning "something given." Today, DATA is used in English both as a plural noun meaning "facts or pieces of information" (*These data are described more fully elsewhere* ) and as a singular mass noun meaning "information"; *Not much data is available on flood control in Brazil.* It is almost always treated as a plural in scientific and academic writing.
　da'ta proc'essing[:] processing of information or the handling of information by computers in accordance with strictly defined systems of procedure. Also called information processing.

**3.** Several words—such as "collected," "generated," "compiled," "gathered," "created," or "recorded"—would work as synonyms or substitutes for "documented" in this context.

er's "data"—that can then be electronically processed.

In a case raising a similar issue, the Minnesota Supreme Court, in *Keezer v. Spickard*, 493 N.W.2d 614 (1992), concluded that the statutory term "data"—in a state "Data Practices Act"—did not apply to government-held information, until the information had been physically recorded in some fashion other than the mental impressions of the observer.

In other words, government-held information did not become "data" for purposes of the Minnesota Data Practices Act, until a record of some sort that was based on the information, had been created.

The Minnesota court stated:

> The threshold question we must answer is "Did the statements disclose government data?" Answering this question is difficult because the Act does not define the word "data." ... The failure to state whether data must be in a physical form to be government data creates an ambiguity in the Act because of the unique nature of data. The word "data" means information and can refer to information in any form. *See* Webster's Seventh New Collegiate Dictionary 210 (1972). To create data it is not necessary to write anything, enter anything into a computer, or make a record of any kind. Data exist when a person knows something. If the Act is read literally, the term "government data" can include knowledge that exists only in the mind of a government employee. For example, if a government employee asks a license applicant a question for the purpose of filling out a license application form, it would not be necessary for the employee to fill in the form to create government data. Data would exist as soon as the applicant responds to the question and the employee comprehends the answer. Because the employee stores the data in some physical form in the brain, the unrecorded information would be "government data" under a

literal interpretation of the Act. We cannot believe the legislature intended the term "government data," to be literally interpreted to include unrecorded data that exist only in a human brain. Interpreting "government data" to include mental impressions formed by public employees during the course of employment would lead to absurd results.... The Act "regulates the collection, creation, storage, maintenance, dissemination, and access to government data." ... By referring separately to each function, this subdivision indicates the Act is intended to do more than simply regulate physical access to government records. The Act is intended to regulate every aspect of how the government manages the information it collects and records. It is nearly impossible to regulate any function related to data until a record is created somewhere outside the human brain. To give effect to the Act, *we conclude that information is not "government data" until the information is recorded somewhere other than the human brain....* A plaintiff cannot establish the Act was violated merely by showing a government employee said something about him and that the statement contained information that arguably might be stored in a government record. If the information in the employee's statement was not actually recorded, then "government data" have not been created or released.

493 N.W.2d at 616—618 [4]

RGIS says that "*each unit of product on a customer's shelves is data.*" (RGIS Brief, *supra*, emphasis added).

However, based on the foregoing reasoning, we do not believe that the Legislature intended the expansive definition of the term "data" that RGIS urges that we adopt. We do not believe that the Legislature intended that the actual cans of peas that a store possesses on its shelves—or the mental impressions that are formed by inventory takers in observing those cans of peas—are

---

**4.** We have taken a similar approach to the Minnesota court, in Syllabus Point 1 of *Affiliated Const. Trades Foundation v. Regional Jail and Correctional Facility Authority*, 200 W.Va. 621, 490 S.E.2d 708 (1997), where we held that our

Freedom of Information Act, *W.Va.Code*, 29B–1–1 *et seq.* does not require the *creation* of public records—only the disclosure of non-exempt information from existing records.

"data," as that term is used in *W.Va.Code*, 11–5–9(a)(22) [1997].

Rather, we believe that *W.Va.Code*, 11–5–9(a)(22) [1997], properly viewed through the lens of strict construction that is applicable to tax exemptions, and as applied to the facts of RGIS's operations, contemplates that "data" comes into existence when information about a store's inventory is recorded in some fashion other than the mind of the observer. We follow the reasoning of the *Keezer* court, and conclude that neither the items of a customer's inventory, nor the RGIS employees' observations of those items themselves, are "data"—until information about those items or observations is recorded in some fashion other than the mental impressions of the observer.

If a store's employees (or RGIS employees) observe the characteristics of an inventory (number, size, etc.) and record information based on those observations on computers (or, for that matter, on sheets of paper), that recorded information is then "another's data" that RGIS can electronically process.

The Commissioner agrees (see Commissioner's Brief, *supra*) that such subsequent processing of once-recorded data by RGIS does fall under the statutory exemption for electronic data processing. But the Commission argues, and we agree, that RGIS's actual taking of the inventory—by observing items in a customer's stock and recording information from those observations—is not the "processing of another's data." That service is rather the *creation* of another's data.

■ Based on this reasoning, we hold that the service of observing and electronically recording information about a customer's inventory by an inventory services company is the creation of data and is not exempt from sales tax under the "electronic data processing" exemption established at *W.Va.Code*, 11–15–9(a)(22) [1997]. However, electronic processing of such inventory data by an inventory services company, once the data has been created, does fall within this exemption.

IV.

*Conclusion*

The order of the circuit court is reversed and this case is remanded for further proceedings consistent with this opinion.

Reversed.