IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2022 Term

FILED

**April 26, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 20-0755

AMIE MILLER,
Plaintiff Below, Petitioner,

v.

ST. JOSEPH RECOVERY CENTER, LLC,
A DELAWARE LIMITED LIABILITY COMPANY;
ST. JOSEPH'S OPERATING COMPANY, LLC,
A DELAWARE LIMITED LIABILITY COMPANY; AND
SILTSTONE HOLDINGS, LLC,
A DELAWARE LIMITED LIABILITY COMPANY,
Defendants Below, Respondents.

_____

Appeal from the Circuit Court of Wood County
The Honorable Jason A. Wharton, Judge
Civil Action No. 19-C-226

REVERSED AND REMANDED
_____

Submitted: January 25, 2022
Filed:  April 26, 2022

Walt Auvil, Esq.
Kirk Auvil, Esq.
Anthony Brunicardi, Esq.
The Employment Law Center, PLLC
Parkersburg, West Virginia
Attorneys for the Petitioner

Philip A. Reale, II, Esq.
Law Office of Philip A. Reale, PLLC
Charleston, West Virginia
Attorney for the Respondents

CHIEF JUSTICE HUTCHISON delivered the Opinion of the Court.

JUSTICE ARMSTEAD concurs, in part, and dissents, in part, and reserves the right to file a separate opinion.

JUSTICE ALAN D. MOATS, sitting by temporary assignment, not participating.

**SYLLABUS BY THE COURT**

1.      "In reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied.  The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard.  Questions of law are subject to a de novo review."  Syl. Pt. 1, *Public Citizen, Inc. v. First National Bank in Fairmont*, 198 W. Va. 329, 480 S.E.2d 538 (1996).

2.      "Where the terms of a contract are clear and unambiguous, they must be applied and not construed."  Syl. Pt. 2, *Bethlehem Mines Corp. v. Haden*, 153 W. Va. 721, 172 S.E.2d 126 (1969).

3.      "Pursuant to W. Va. Code § 21-5-1(c) (1987), whether fringe benefits have then accrued, are capable of calculation and payable directly to an employee so as to be included in the term 'wages' are determined by the terms of employment and not by the provisions of W. Va. Code § 21-5-1(c).  Further, the terms of employment may condition the vesting of a fringe benefit right on eligibility requirements in addition to the performance of services, and these terms may provide that unused fringe benefits will not be paid to employees upon separation from employment."  Syl. Pt. 5, *Meadows v. Wal-Mart Stores, Inc.*, 207 W. Va. 203, 530 S.E.2d 676 (1999).

**HUTCHISON, Chief Justice:**

Petitioner Amie Miller ("Ms. Miller") appeals the September 2, 2020, trial order of the Circuit Court of Wood County granting judgment in favor of the respondent, St. Joseph Recovery Center, LLC ("SJRC"), following a bench trial and dismissing her civil action.[1]  In her complaint, Ms. Miller alleged that SJRC violated the terms of her *Employee Agreement*, the *Employee Handbook,* and the West Virginia Wage Payment and Collection Act by failing to provide her severance pay and compensation for accrued paid time off upon her resignation.  In its trial order, the circuit court concluded that Ms. Miller's resignation was not for a "good reason," and therefore, Ms. Miller was not entitled to a severance package.  Ms. Miller appeals the trial order and other pre-trial summary judgment rulings of the circuit court including the denial of her claim for payment of accrued paid time off pursuant to the *Employee Handbook*.  Upon consideration of the terms contained in the *Employee Agreement* and *Employee Handbook,* we find that the circuit court erred.  Accordingly, we reverse the rulings of the circuit court and remand for further proceedings consistent with this opinion.

---

[1] As will be more fully set forth below, Ms. Miller also named two other entities as defendants in this matter—St. Joseph's Operating Company, LLC, and Siltstone Holdings, LLC.  Both entities, in addition to SJRC, were represented by the same counsel.  However, St. Joseph's Operating Company, LLC, and Siltstone Holdings, LLC were dismissed by the circuit court during its summary judgment ruling.  Ms. Miller does not challenge the dismissal on appeal.

## I. Facts and Procedural Background

On January 2, 2019, Ms. Miller was hired as a nurse practitioner at SJRC in Parkersburg, West Virginia. The terms and conditions of Ms. Miller's employment were governed by an employment contract titled *Employment Agreement*. Some of these terms included, but were not limited to, compensation, termination, resignation, and the availability of severance pay. Specifically, the *Employment Agreement* provided that if Ms. Miller resigned because SJRC materially breached its contract obligations – what the agreement called a "Good Reason" – then she would receive a severance package from SJRC. The *Employment Agreement* stated, in pertinent part, the following:

4.4     Voluntary Resignation

In the event that the Employee voluntarily resigns, the Employee will give a minimum of three (3) months advance written notice to the Company, except in the case of voluntary resignation for Good Reason as provided for in this Agreement. In the event that the Employee resigns for Good Reason, he shall be entitled to the Severance Package set forth in Section 4.6 below.

4.5     No Termination Payment for Resignation Without Good Reason or Termination for Cause

Upon the termination of the Employee's employment (i) for Cause; or (ii) by voluntary resignation by the Employee pursuant to Section 4.4 without Good Reason, as hereinafter defined: the Employee shall not be entitled to any termination or severance payment, other than the compensation earned by the Employee for the period before the date of cessation of his/her employment calculated up to and including the date of cessation of his/her employment[.]

4.6     Termination by the Company without Cause; Resignation for Good Reason

2

(a) The company may terminate the employment of the Employee in its absolute discretion, without Cause, and for any reason, upon providing the Employee with one (1) month notice and a Severance Package ("the Severance Package") consisting of Base Salary paid monthly in accordance with the Company's normal payroll practices for the lesser of (A) the number of full months of the then remaining term of the Agreement; or (B) three (3) months, together with health insurance coverage during the severance period. The provisions of the Severance Package shall constitute full and final satisfaction of all rights and entitlements that the Employee has or may have arising from or related to the termination of his/her employment, whether pursuant to statute, contract, common law, or otherwise.

(b) Employee's employment will be deemed to have been terminated without Cause if the Company materially breaches its obligations to provide him/her compensation or benefits or breaches any other material term of this Agreement, each reason of which shall constitute "Good Reason" for resignation by the Employee as set forth in Section 4.4, above, or in the event that there is a Change of Control, and the Company's successor does not assume and honor this Agreement.

4.7     Total Severance Compensation

Except as set forth in this Agreement, the Employee shall not be entitled to any compensation for wrongful dismissal, severance pay, or termination pay, if the employment of the Employee is terminated pursuant to the terms hereof.

In addition, Ms. Miller was also issued an *Employee Handbook* which provided that SJRC would pay her any "accrued, unused paid time off" if she gave at least

two weeks of notice before resigning and if she left "in good standing."  The *Employee Handbook* contained the following relevant provisions:

> 3.8 Employment at Will
>
> . . . .
>
> Because you are employed at will, either you or the company may terminate the employment relationship at any time, for any reason, with or without notice.  Employees providing proper notice will be considered to have left in good standing and may be eligible for the payment of certain accrued, unused paid time off.  Those employees deemed to have not left in good standing will not be eligible for any accrued, unused paid time off, and they will not be eligible for rehire.
>
> . . . .
>
> 3.15 Voluntary Resignation Procedure
>
> Employees who resign voluntarily are required to submit their notice in writing to human resources and their department heads.  It must include the date the notice is given, the reason for termination (i.e., to take another job, return to school, etc.) and the last day of work.  Management and all salaried staff must give 30 days' notice, and all other positions must give two weeks' notice. Employees who fail to give and/or work the proper notice will not be eligible for the payment of eligible, available paid time off, and will not be eligible for rehire.

Around June 18, 2019, Ms. Miller tendered a resignation letter to SJRC's CEO, Donna Meadows, and its Director of Nursing, Tabitha Smith.  In the letter, Ms. Miller stated that she had "received an offer to work as a Nurse Practitioner at a halfway house in Marietta, Ohio.  After careful consideration [she] realized that this opportunity [was] too

exciting to decline."[2]  Ms. Miller further indicated that her last day of work would be August 15, 2019.  Although she gave nearly two months of notice, the parties later agreed that Ms. Miller's employment would extend only two weeks beyond the date on which she tendered her resignation letter, to July 3, 2019.

Following her resignation, Ms. Miller initiated a lawsuit against SJRC and two other related entities.  She alleged that SJRC failed to timely pay her wages on four occasions and thereby materially breached the *Employment Agreement* which triggered the "Good Reason" for resignation provision and SJRC's duty to pay her a severance package. Ms. Miller also recounted Sections 3.8 and 3.15 of the *Employee Handbook* and claimed that under those sections she was entitled to accrued, unused time off, amounting to fifty-six hours at $55.29 per hour.  Additionally, Ms. Miller asserted that SJRC's failure to pay her the severance package under the *Employment Agreement* and its failure to pay "accrued, unused paid time off" specified in the *Employee Handbook* constituted violations of the West Virginia Wage Payment and Collection Act ("WPCA" or the "Act").

---

[2] Ms. Miller further expressed:

It has been a great pleasure to work on your team for the past 6 months, and I hope you understand that this was a difficult decision.  The skills that I have learned in your facility will be an asset with all my future patients.  I would like to thank you for the ability to work as part of a great team while furthering my education and my career path.

I am fully committed to assisting with this transition and with training my replacement and in any other matters that will be required in this transition period.

SJRC moved for summary judgment and argued that Ms. Miller did not resign for "good reason," as evidenced by her resignation letter stating that she was leaving her employment to pursue a more "exciting" employment opportunity. Therefore, SJRC argued that Ms. Miller was not entitled to the severance pay provided for in the *Employment Agreement*. SJRC also argued that Ms. Miller had no viable WPCA claim because her claim for fringe benefits (the accrued and unused vacation time) was governed by the *Employment Agreement*, not the Act.

Following a hearing on the motion for summary judgment, the circuit court issued a letter on August 12, 2020, containing "an informal summary." The circuit court found SJRC's *Employment Agreement* to be the "controlling document" and that the *Employee Handbook* did not modify the terms of the *Employment Agreement*. The court further found that Section 4.6 of the *Employment Agreement* identified what Ms. Miller was entitled to receive at the time of separation from employment with SJRC, and that the *Employment Agreement* specified that the severance package was to constitute full and final satisfaction if Ms. Miller qualified for that package. The court also found that "'severance pay,' by its very nature, cannot be 'earned' by a plaintiff until after she is terminated. Therefore, severance pay is not 'compensation for labor or services rendered'

by the plaintiff" and, therefore, does not meet the definition of "wages" under the WPCA.[3]

Finally, the court found

> that the issue of whether [Ms. Miller] left [SJRC] with or without cause is a question of fact for the jury to determine. Although the letter submitted to [SJRC] appears on its face to be dispositive of the issue, counsel for [Ms. Miller] set forth reasonable grounds that a jury should be permitted to evaluate concerning [Ms. Miller's] reasons for leaving her employment.[4]

(Footnote added).

After appearing for a pretrial conference on August 24, 2020, the parties appeared for a bench trial on September 1, 2020.[5] Several SJRC former employees testified

---

[3] The circuit court further found that the entities affiliated with SJRC and sued by Ms. Miller were not proper parties to the action and dismissed them from this case. Ms. Miller does not appeal the dismissal of the other entities.

[4] Ms. Miller argued in response to SJRC's motion for summary judgment that her "motivation for resignation is not subject to resolution upon summary judgment, as the jury could reasonably conclude she was indeed motivated by not being paid." Ms. Miller further stated, "[u]ltimately, [Ms. Miller's] reason for resignation is an issue of material fact that should negate the granting of [SJRC's] Motion for Summary Judgment[.]"

[5] The day after the pretrial conference, counsel for SJRC contacted the court to notify it of "[a]n issue [that] has come up that appears will need some intervention from the court." Specifically, in light of the court's summary judgment ruling that the *Employment Agreement* was "the controlling document," SJRC "believe[d] that pursuant to the Agreement, a bench trial [was] mandated." In that regard, the *Employee Agreement* provided: "Each party hereby waives . . . any right it may have to a trial by jury in respect to litigation . . . arising out of . . . this Agreement." Ms. Miller disagreed with SJRC's assertion regarding the jury trial waiver, noting that no briefing had occurred regarding that issue, that SJRC demanded a jury trial in its answer to Ms. Miller's complaint, that the scheduling order set the matter for jury trial, that the deadline for filing any motion had passed, and that SJRC had affirmatively waived its right to a bench trial as set forth in the

regarding the four late paydays that occurred during Ms. Miller's tenure, beginning with the March 29, 2019, payday. Pay was also late on the next payday, April 12, 2019, as well as April 26, 2019, and June 7, 2019. During her testimony, Ms. Miller stated that "it was well known that employees, including [herself] were not happy with not being paid and [they] were worried there was going to come a time that [they] would not get a paycheck at all." However, Ms. Miller also testified that on at least one occasion, she agreed to be paid late:

> Yes. It was April 12. I believe it was April 12 pay period. Donna [CEO] did ask us, she told Tabby [Director of Nursing] she had a conversation with Lori and the top five paid people, which would be Donna, Tabby, myself, Jordan, and Lori would not be paid so the [hourly] employees could be paid.

Ms. Miller was then asked whether she believed her resignation to be for "good reason" under the terms of the *Employment Agreement*. Ms. Miller stated that she did believe her resignation was for "good reason" and that she believed her termination would result in her being paid the severance package provided for in that agreement. She testified that she began to look for other employment around April 5, 2019, after not being paid timely by SJRC. However, Ms. Miller did not list "untimely payment" in her resignation letter because she

> didn't feel that was appropriate to put in a resignation letter. . . . I was raised that you don't burn your bridges. We live in a small community. There are not many places for nurse practitioners to work. How would I know if later on down the road if I was going to work at, let's say, WVU Medicine,

---

*Employee Agreement*. The court held a hearing on August 26, 2020, to resolve the jury trial waiver issue. The court ultimately concluded that a bench trial would take place.

8

> Donna [the CEO,] could be hiring there; she could be working there. You just don't burn your bridges.

Ms. Miller testified on direct examination that the CEO was fully aware of the actual reason for her departure as they discussed it numerous times, and she testified directly that the late payments were the reason she looked for and accepted employment elsewhere. As for the two-month notice given, Ms. Miller testified that she approached the CEO about resigning and told her that she had two different resignation letters: one letter giving the required three-month notice, and another letter giving a two-month notice. Ms. Miller ultimately submitted the resignation with a two-month notice.

Thereafter, on cross-examination, Ms. Miller acknowledged informing the CEO that the halfway house at which she had accepted employment was closer to her home and "ma[de] her daily drive a lot easier," and she acknowledged that there was nothing in her resignation letter stating that she left her employment because of anything respondent did wrong. Likewise, Ms. Miller did not demand her severance package, nor did she address the severance package when she submitted her resignation letter. Although she testified that she "contact[ed] [SJRC] about vacation pay that [she] was not paid for," her demand for the severance package was made by her counsel. Ms. Miller also acknowledged, on cross-examination, that despite her late payments, she continued to work and perform expected duties, and SJRC always "made right on [its] obligation to pay their wages." SJRC was up to date on its payment obligations at the time of Ms. Miller's resignation.

By order entered September 2, 2020, the circuit court found that SJRC materially breached the *Employment Agreement* by paying Ms. Miller late on four occasions. However, the circuit court found that despite this breach, the weight of the evidence was

> inconsistent with the position that at the time of the presentation of [Ms. Miller's] letter of resignation that she believed she was entitled to the severance package set forth in the [E]mployment [A]greement. The evidence reflects at no time during the discussion on the day of her resignation that [Ms. Miller] brought up to Donna Meadows [CEO] the severance package.

Furthermore,

> [i]f [Ms. Miller] believed that she was entitled to a severance package due to the alleged breach, pursuant to Section 4.4 of the Agreement she would not have been required to provide any notice, yet she prepared a letter giving full notice and a letter with a reduced period of notice and offered each to SJRC. Neither of these letters made any references to the severance package.

The court determined that "[t]hese facts lend more weight and credit to the specific words chosen by [Ms. Miller] in composing her resignation letter[,] . . . which set forth her reasons for leaving SJRC[,]" including that it was a "difficult decision" but ultimately an opportunity "too exciting to decline." Thus, the circuit court concluded that Ms. Miller "failed to prove by a preponderance of the evidence that . . . her resignation constituted termination without cause under the terms of the contract[,] . . . and [she] is therefore not entitled to the severance package set forth in the Employment Agreement." This appeal followed.

10

## II. Standard of Review

This Court previously has held that

> [i]n reviewing challenges to the findings and conclusions of the circuit court made after a bench trial, a two-pronged deferential standard of review is applied. The final order and the ultimate disposition are reviewed under an abuse of discretion standard, and the circuit court's underlying factual findings are reviewed under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 1, *Pub. Citizen, Inc. v. First Nat'l Bank in Fairmont*, 198 W. Va. 329, 331, 480 S.E.2d 538, 540 (1996). With regard to the circuit court's summary judgment rulings, our review is de novo. *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is entered *de novo*.").

In reaching its decisions, the circuit court interpreted and applied the terms contained within the parties' *Employment Agreement* and *Employee Handbook*. We previously have held that "'[i]t is the province of the Court . . . to interpret a written contract.' Syl. Pt. 1[, in part], *Stephens v. Bartlett*, 118 W.Va. 421, 191 S.E. 550 (1937)." Syl. Pt. 1, in part, *Orteza v. Monongalia Cnty. Gen. Hosp.*, 173 W.Va. 461, 318 S.E.2d 40 (1984). Because it is generally a question of law, "we apply a *de novo* standard of review to [a] circuit court's interpretation of [a] contract." *Finch v. Inspectech, LLC*, 229 W. Va. 147, 153, 727 S.E.2d 823, 829 (2012) (citation omitted); *see also*, Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W. Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.").

11

With these standards in mind, we now proceed with our examination of the parties' arguments.

## III.    Discussion

In the case sub judice, Ms. Miller raises multiple assignments of error. Each of these assignments of error will be addressed in turn.

### A.    Resignation for "Good Reason"

Ms. Miller first argues that the circuit court erroneously dismissed her claim for severance pay after concluding that she was not entitled to this relief since she did not resign for "Good Reason" as defined by the *Employment Agreement*. Ms. Miller further contends that after the circuit court found that SJRC had materially breached the *Employment Agreement* by failing to pay her on time, the court's subsequent finding that Ms. Miller did not resign because she had been paid late was wrong. Per Ms. Miller's argument, the record overwhelmingly supports the notion that Ms. Miller resigned because she was not being paid in a timely manner. In rebuttal, SJRC does not contest that it breached its duties under the *Employment Agreement*; however, SJRC maintains that the circuit court did not err in finding that Ms. Miller did not resign for "Good Reason" because the issue of "cause" pursuant to the *Employment Agreement* is a subjective, factual matter. It contends that the record reflects that the circuit court was presented with evidence and testimony which allowed the court to make a decision as to whether "Good Reason" existed. According to SJRC, after reviewing and weighing such evidence, i.e. Ms. Miller's

resignation letter, testimony, etc., the circuit court correctly decided that "Good Reason" did not exist. We disagree.

This Court has long recognized that "[w]here the terms of a contract are clear and unambiguous, they must be applied and not construed." Syl. Pt. 2, *Bethlehem Mines Corp. v. Haden*, 153 W. Va. 721, 172 S.E.2d 126 (1969). Furthermore, "[i]t is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them." Syl. Pt. 3, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962).

By applying these principles to the case sub judice, it is evident that the circuit court erred in balancing the concurrent motivations for Ms. Miller's resignation. Here, we have a valid *Employment Agreement* that clearly sets forth in Section 4.4 that when an employee "voluntarily resigns, the [e]mployee will give a minimum of three (3) months advance written notice to the Company, *except in the case of voluntary resignation for Good Reason* as provided for in this Agreement." (Emphasis added). Section 4.4 also states that "[i]n the event that the [e]mployee resigns for Good Reason, [s]he shall be entitled to the Severance Package set forth in Section 4.6 below." In accordance with Section 4.6, "Good Reason" exists when SJRC "breaches its obligation to provide the [employee] compensation or benefits or *breaches any other material term of this Agreement*[.]'" (Emphasis added).

13

In the trial order, the circuit court specifically found that "SJRC materially breached its obligation to provide [Ms. Miller] compensation or benefits by failing to make payments of the base salary in accordance with the Company's regular payroll practices." SJRC's breach of its obligations impelled Ms. Miller to seek employment elsewhere. These findings are clearly supported by the record. The analysis should have ended there, and the circuit court should have applied the clear terms of the *Employment Agreement*; however, the circuit court continued its analysis and found that the evidence was "inconsistent with the position [of Ms. Miller] that at the time of the presentation of her letter of resignation that she believed she was entitled to the severance package set forth in the [E]mployment [A]greement." While it is true that Ms. Miller wrote that she resigned because she found another job opportunity that was "too exciting to decline," the record is clear that Ms. Miller sought out that other job because of SJRC's material breach of its contract obligations.

The parties' relationship was, in part, governed by the terms of the *Employment Agreement*. The terms of the *Employment Agreement*, as set forth above, are clear: if SJRC breached the agreement, then "Good Reason" existed, and a resigning employee was entitled to the severance package. Nothing in the *Employment Agreement* required the parties or the court to search for another underlying or concurrent motivation or reason. Here, the circuit court made a clear finding that SJRC breached its written contract obligations, and therefore, Ms. Miller met the definition of a "Good Reason" for resigning as defined by the contract. Ms. Miller was indisputably entitled to the severance

14

package in accordance with the unambiguous terms of the *Employment Agreement*, and the circuit court erred in finding otherwise.

### B. *Severance Package as Wages Under the WPCA*

Next, Ms. Miller argues that the circuit court's ruling—that the severance package owed pursuant to the *Employment Agreement* was not "wages" pursuant to the WPCA—was clearly erroneous. Ms. Miller contends that she is entitled to the severance package because the terms of the *Employment Agreement* defined severance pay as wages, thereby triggering the applicability of the civil penalties under the WPCA, located at West Virginia Code §§ 21-5-1 to 21-5-18. On the contrary, SJRC adopts the conclusion of the circuit court and argues that the severance package at issue cannot be considered wages because the severance package is a sum certain that was negotiated at the time the *Employment Agreement* was entered into, and therefore, cannot be earned until after the employment relationship is severed.

We begin our analysis by examining the WPCA. As such, we are mindful that "[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature." Syl. Pt. 1, *Smith v. State Workmen's Comp. Comm'r*, 159 W. Va. 108, 219 S.E.2d 361 (1975). Therefore, where the legislative intent is plainly expressed, we are required to apply rather than interpret the statute at issue. "When a statute is clear and unambiguous and the legislative intent is plain, the statute should not be interpreted by the courts, and in such case it is the duty of the courts not to construe but to apply the statute."

15

Syl. Pt. 5, *State v. Gen. Daniel Morgan Post No. 548, Veterans of Foreign Wars*, 144 W. Va. 137, 107 S.E.2d 353 (1959). Conversely, "[a] statute that is ambiguous must be construed before it can be applied." Syl. Pt. 1, *Farley v. Buckalew*, 186 W. Va. 693, 414 S.E.2d 454 (1992). With these standards in mind, we turn our attention to the WPCA.

In *Mullins v. Venable*, 171 W. Va. 92, 297 S.E.2d 866 (1982), this Court discussed the purpose and intent of the WPCA. We stated:

> The West Virginia Wage Payment and Collection Act is remedial legislation designed to protect working people and assist them in the collection of compensation wrongly withheld. *Farley v. Zapta Coal Corp.,* 167 W. Va. 630, 281 S.E.2d 238 (1981). The Act requires every "person, firm or corporation" doing business in West Virginia to pay their employees wages for work or services at least once every two weeks, unless otherwise provided by special agreement. W. Va. Code § 21-5-3. Whenever an employee quits or resigns the "person, firm or corporation" must pay the employee's wages and accrued fringe benefits no later than the next regular payday. W. Va. Code § 21-5-4(c); *Farley v. Zapata Coal Corp.*, *supra.* If the employer fails in this duty, the "person, firm or corporation" is liable, in addition to wages and benefits, for liquidated damages. W. Va. Code § 21-5-4(e).

*Mullins*, 171 W. Va. at 94, 297 S.E.2d at 869. *Accord* Syl. Pt. 7, *Grim v. E. Elec., LLC*, 234 W. Va. 557, 767 S.E.2d 267 (2014). As such, because the WPCA is a remedial statute, we must construe it liberally. *See State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.,* 194 W. Va. 770, 777, 461 S.E.2d 516, 523 (1995) ("Where an act is clearly remedial in nature, we must construe the statute liberally so as to furnish and accomplish all the purposes intended." (internal citations omitted)).

16

It is the task of this Court to determine whether the circuit court erred in finding that Ms. Miller's severance package—as set forth in the *Employment Agreement*—did not constitute wages under the WPCA. The WPCA provides that when an employee resigns from his or her employment, the employer "shall pay the employee's wages no later than the next regular payday." *See* W. Va. Code § 21-5-4(c) (2018). However, "if the employee gives at least one pay period's notice[,]" then the employer "shall pay all wages earned by the employee at the time of quitting." *See id.*

In our discussion above, we concluded that Ms. Miller was entitled to the severance package set forth in the *Employment Agreement*. However, whether Ms. Miller is entitled to the civil penalty provisions of the WPCA, arising from SJRC's failure to timely provide the severance package, is contingent on whether the severance package constitutes wages. West Virginia Code § 21-5-1(c) (2015)[6] defines wages as

> compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation. As used in § 21-5-4, § 21-5-5, § 21-5-8a, § 21-5-10, and § 21-5-12 of this code, *the term "wages" shall also include then accrued fringe benefits capable of calculation and payable directly to an employee*[.]

(Emphasis added). However, West Virginia Code § 21-5-1(c) also provides "[t]hat nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his or her employees which does not contradict the provisions of

---

[6] West Virginia Code § 21-5-1 was modified by the Legislature in 2021. However, no changes were made that affect our decision.

17

this article." Fringe benefits are defined by the WPCA as "any benefit provided an employee or group of employees by an employer, or which is required by law, and includes regular vacation, graduated vacation, floating vacation, holidays, sick leave, personal leave, production incentive bonuses, sickness and accident benefits, and benefits relating to medical and pension coverage." W. Va. Code § 21-5-1(*l*). Here, the Legislature used the word "includes" to signify that the list of fringe benefits is meant to be a nonexclusive list of examples. *See, e.g.*, *RGIS Inventory Specialists v. Palmer*, 209 W. Va. 152, 157, 544 S.E.2d 79, 84 (2001) (stating that "the use of the term of enlargement 'including' signifies a nonexclusive list").

In the case sub judice, the *Employment Agreement* provides that if an employee voluntarily resigns for good reason, he or she will be "entitled to the Severance Package set forth" in the *Employment Agreement*. Pursuant to the provisions of the Agreement, the "Severance Package" consists of "[b]ase [s]alary paid monthly in accordance with [SJRC's] normal payroll practices for the lesser of (A) the number of full months of the then remaining term of the Agreement; or (B) three (3) months, together with health insurance coverage during the severance period." Based upon the clear language of the *Employment Agreement*, we conclude that Ms. Miller's severance package is a benefit provided to employees at SJRC as an inducement to procure their services, and therefore, fits within the Act's definition of a "fringe benefit." *See generally* W. Va. Code § 21-5-1(*l*).

18

The parties dispute, however, whether Ms. Miller's "fringe benefit" (the severance package) is "capable of calculation and payable directly to [the] employee" such that it can qualify as "wages" under the WPCA. In *Meadows v. Wal-Mart Stores, Inc.*, 207 W. Va. 203, 530 S.E.2d 676 (1999), this Court examined the language of West Virginia Code § 21-5-1(c) to determine what it meant for wages to also include "then accrued fringe benefits" that are "capable of calculation and payable directly to an employee." The Court stated:

> The parties agree concerning the meaning of "capable of calculation." They also agree that fringe benefits may be calculated in a manner agreed upon by the employees and employers so long as the agreement does not contradict the provisions of W. Va. Code § 21-5-1 *et seq.* The parties do not agree, however, concerning the meaning of the term "then accrued."
>
> In order to define "then accrued," we give the term its familiar and ordinary meaning.
>
> . . . .
>
> In light of the above, we believe the proper definition of the word "accrued" in W. Va. Code § 21-5-1(c) is "vested."
>
> The concept of vesting is concerned with expressly enumerated conditions or requirements all of which must be fulfilled or satisfied before a benefit becomes a presently enforceable right. Because the WPCA contains no such conditions or requirements, the payment of fringe benefits can only be governed by the terms of employment found in employment policies promulgated by employers and agreed to by employees. Accordingly, the terms of the applicable employment policy, and not the WPCA, determine whether fringe benefits are included in the term "wages" under W. Va. Code § 21-5-1(c).

19

*Meadows*, 207 W. Va. at 215-16, 530 S.E.2d at 688-89. After determining the meaning of "then accrued," the *Meadows* Court ultimately held in Syllabus point 5, that

> [p]ursuant to W. Va. Code § 21-5-1(c) (1987), whether fringe benefits have then accrued, are capable of calculation and payable directly to an employee so as to be included in the term "wages" are determined by the terms of employment and not by the provisions of W. Va. Code § 21-5-1(c). Further, the terms of employment may condition the vesting of a fringe benefit right on eligibility requirements in addition to the performance of services, and these terms may provide that unused fringe benefits will not be paid to employees upon separation from employment.

*See also* Syl. Pt. 5, *Adkins v. Am. Mine Rsch., Inc.*, 234 W. Va. 328, 765 S.E.2d 217 (2014) ("The determination as to whether 'wages,' as defined in West Virginia Code §21-5-1(c) (2013 Repl. Vol.), are payable pursuant to the requirements of West Virginia Code §21-5-1 *et seq.* (2013 Repl. Vol.) is governed by the terms of the employment agreement, whether written or in the form of a consistently applied unwritten policy.").


In accordance with this Court's discussion above, when Ms. Miller resigned from SJRC for good reason, she became entitled to the severance package pursuant to the provisions of the *Employment Agreement*. SJRC claims that the severance package described in the *Employment Agreement* is not compensation for labor or services, could not be earned until after the end of the employment relationship, and was designed to be contractual damages owed to employees for suffering an unexpected loss, and thus, the

20

severance package cannot be wages under the WPCA.[7] In reply, Ms. Miller contends that the severance package is an unused fringe benefit that is owed to her under the WPCA unless the *Employment Agreement* contains "express and specific" language to the contrary. We agree with Ms. Miller. Under the *Employment Agreement*, at the time of Ms. Miller's separation from employment, the severance package was accrued, capable of calculation, and payable directly to her. The severance package was an inducement to procure an employee's services and represented a form of deferred compensation for work performed during the employment. Therefore, Ms. Miller's severance package is a fringe benefit that constitutes unpaid wages under the WPCA, and SJRC was required to pay those wages in accordance with the timeline provided by the Act. In failing to pay Ms.

---

[7] This Court addressed a similar question in *Citynet, LLC v. Toney*, 235 W. Va. 79, 772 S.E.2d 36 (2015). In *Citynet*, an employee sought to redeem the vested balance of his employee incentive plan account. In arguing that the incentive plan account was not subject to the WPCA, Citynet argued that the employee failed to show that he was entitled to the fringe benefit under the terms of the agreement. This Court disagreed with Citynet and stated:

> Citynet fails to appreciate that the ability of an employer to "condition the vesting of a fringe benefit right on eligibility requirements," or to decline to pay unused fringe benefits "to employees upon separation from employment," *does not* allow an employer to fail to pay *vested fringe benefits* to an employee upon separation from employment. In this regard, the *Meadows* Court observed that "W. Va. Code § 21-5-1(c) simply means that *if under the terms of employment an employee is entitled to the payment of fringe benefits, the payment of these benefits has the same status as unpaid wages.*" *Meadows*, 207 W. Va. at 216, 530 S.E.2d at 689 (emphasis added; footnote omitted).

*Citynet*, 235 W. Va. at 94, 772 S.E.2d at 51.

21

Miller in accordance with West Virginia Code § 21-5-4(c), SJRC violated the WPCA. Accordingly, Ms. Miller is entitled not only to the severance package, but also to the damages, costs and reasonable attorney's fees permitted under the WPCA. *See* W. Va. Code §§ 21-5-4(e) and 21-5-12(b) (1975).

### C. Paid Time Off ("PTO") as Part of Severance Package

Lastly, Ms. Miller argues that her claims for payment of accrued paid time off (PTO) were improperly dismissed by the circuit court. In support of this argument, Ms. Miller states that such payments were earned and due to her under the language of SJRC's *Employee Handbook*, which is a separate document establishing additional terms of her employment with SJRC in conjunction with the *Employment Agreement*. The *Employee Handbook* provides that employees who leave after providing proper notice will be paid their accrued PTO. While the *Employment Agreement* is silent on this issue, Ms. Miller contends that she is entitled to such payment pursuant to *Meadows v. Wal-Mart Stores, Inc.*, *supra*, which states that ambiguities must be resolved in favor of the employee. SJRC disagrees with Ms. Miller's position and maintains that the *Employment Agreement* is sufficiently specific as to the amount of unused fringe benefits owed to an employee upon separation from employment—and unused PTO is not listed in the *Employment Agreement*. SJRC further notes that the terms of Ms. Miller's termination are governed exclusively by the *Employment Agreement*, and any argument citing to the *Employee Handbook* as a legal basis for Ms. Miller's position is both irrelevant and inapplicable to the present matter.

22

Under the WPCA, some types of fringe benefits are encompassed in the definition of wages. *See* W. Va. Code § 21-5-1(c). The WPCA defines fringe benefits as including various types of paid time off such as vacation, sick leave, and personal leave, among other types of benefits. *See* W. Va. Code § 21-5-1(*l*). As stated above, in our discussion about severance pay, we noted that West Virginia Code § 21-5-1(c) defines wages, in part, as "then accrued fringe benefits capable of calculation and payable directly to an employee: *Provided*, That nothing herein contained shall require fringe benefits to be calculated contrary to any agreement between an employer and his or her employees which does not contradict the provisions of this article." As stated in *Meadows*, "the terms of the applicable employment policy, and not the WPCA, determine whether fringe benefits are included in the term 'wages' under W. Va. Code § 21-5-1(c)." 207 W. Va. at 215-16, 530 S.E.2d at 688-89. Additionally, it should be noted that "[t]he 'terms of employment' not only include a written employment agreement but also include[ ] the employer's personnel handbook or manual, personnel policy materials, memoranda and documents intended to be used by employers in establishing the benefits of their employees." *Wolfe v. Adkins*, 229 W. Va. 31, 36, 725 S.E.2d 200, 205 (2011) (citing *Younker v. E. Associated Coal Corp.,* 214 W. Va. 696, 591 S.E.2d 254 (2003)).

In *Wolfe*, former employees brought a lawsuit against their employer and alleged various claims under the WPCA. In particular, the employees sought payment for unused, accumulated sick leave. 229 W. Va. at 32, 725 S.E.2d at 201. Upon review by this Court, it was discovered that the employer did not have any policy that expressly

23

dictated the payment or nonpayment of unused sick leave upon an employee's separation from employment. *Id.* at 38, 725 S.E.2d at 207. Therefore, this Court concluded that the employees were not entitled to the unused sick leave, and ultimately held that

> [w]here there is no provision in a written employment agreement, personnel handbook, personnel policy materials or employer documents granting employees payment for unused, accumulated sick leave upon termination from employment, the unused, accumulated sick leave, upon termination from employment, is not a vested, nonforfeitable fringe benefit under the West Virginia Wage Payment and Collection Act and is not payable to the employees.

*Id.*, Syl.

Contrary to the facts in *Wolfe*, here, SJRC's *Employee Handbook* explicitly includes a provision regarding the payment of unused PTO upon the termination of an employment relationship. It states: "Employees providing proper notice will be considered to have left in good standing and *may* be eligible for the payment of certain accrued, unused paid time off." (Emphasis added). The *Employee Handbook* declares that only employees who fail to give "the proper notice" of their resignation are "not be eligible for the payment of eligible, available paid time off[.]" Because the *Employee Handbook* specifically provides for the payment of "certain accrued, unused paid time off," and because Ms. Miller appears to have given the proper and timely notice to SJRC of her resignation, we conclude that Ms. Miller should be entitled to a determination of her entitlement to receive her unused PTO as part of her severance package. Therefore, on remand, the circuit court

24

is instructed to construe the *Employee Handbook*,[8] properly assess on the record whether Ms. Miller qualified for payment of her PTO upon her departure from employment, and if so the amount of such PTO contemplated by the *Employee Handbook*.[9]

## IV.  Conclusion

For the reasons set forth above, we find that the circuit court erred in dismissing Ms. Miller's claims against SJRC.  Accordingly, the September 2, 2020, trial order of the Circuit Court of Wood County is reversed, and this case is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

---

[8] *See, e.g.*, Syl. Pt. 1, *Toppings v. Rainbow Homes, Inc.*, 200 W. Va. 728, 490 S.E.2d 817 (1997) ("""It is the province of the Court, and not of the jury, to interpret a written contract." Syl. Pt. 1, *Stephens v. Bartlett*, 118 W. Va. 421, 191 S.E. 550 (1937).'  Syllabus Point 1, *Orteza v. Monongalia County General Hospital*, 173 W. Va. 461, 318 S.E.2d 40 (1984).").

[9] We decline to address Ms. Miller's remaining assignments of error, including her contention that the circuit court erred in sua sponte choosing to construe the *Employment Agreement* under Texas law due to a choice of law provision because, as we found above, the terms of the agreement are clear and not subject to construction.